DECISION
Before this Court is Defendant Daniel Biechele's ("Defendant") motion to dismiss one hundred counts of a grand jury indictment pursuant to R.I. Super. R. Crim. P. 12. Defendant faces two hundred manslaughter counts based on G.L. 1956 § 11-23-1. The first one hundred counts charge Defendant with involuntary manslaughter resulting from criminal negligence; the second one hundred counts charge Defendant with involuntary manslaughter resulting from the commission of an unlawful act ("misdemeanor manslaughter"). Defendant moves to dismiss counts the misdemeanor manslaughter counts for failure to state an offense under Rhode Island law and for failure to provide fair warning in violation of R.I. Const. art I, §§ 2, 7, 10, art. 6, § 2 and U.S. Const. amend. V, XIV.[1] Defendant also challenges the grand jury trial based on alleged prosecutorial misconduct.
 FACTS
Defendant was the "tour manager"[2] of "Great White," a band that performed at The Station, a nightclub located in Warwick, Rhode Island. On February 20, 2003, the Defendant allegedly ignited pyrotechnic devices ("D.O.T. Class C" Fireworks — Classification 1.4) inside the Station as part of the band's performance. The ignition of the pyrotechnics would constitute a misdemeanor if the Defendant was not licensed to possess, control, or use the pyrotechnics under § 11-13-1. The State alleges that the pyrotechnics started a fire inside The Station that proximately caused the deaths of one hundred people.
Defendant filed a motion to dismiss along with two supporting memoranda, a general memorandum in support of the motion (Dismiss) and a specific memorandum presenting the constitutional argument (Fair Notice). The Defendant also filed a separate motion to dismiss based on double jeopardy or election.[3]
The State filed an objection to the motions to dismiss and supporting memorandum (Objection). Defendant replied to the State's Objection with a response memorandum (Response). Both Defendant and State argued before this Court on October 26, 2005 (Hr'g Tr.); the Defendant filed a letter detailing further legal authority (Letter Rebuttal), as well as a Post-Argument Rebuttal Memorandum (Defense Rebuttal). The State also filed a Post-Argument Rebuttal Memorandum (State Rebuttal). Defendant further joined in a supplemental motion (Supp. Motion) to dismiss indictments based on alleged prosecutorial misconduct during the grand jury indictment.[4] The State filed an objection (Supp. Objection), to which the Defendant replied with a Memorandum (Supp. Reply).
 MISDEMEANOR MANSLAUGHTER IN RHODE ISLAND
Section 11-23-3 requires that "[e]very person who shall commit manslaughter shall be imprisoned not exceeding thirty (30) years." It is settled law in Rhode Island that because manslaughter is not defined within the statute, it takes the same meaning as defined in common law. State v. Fenik, 45 R.I. 309,314, 121 A. 218, 221 (1923). Common law also dictates that manslaughter is classified as either voluntary or involuntary.State v. Vargas, 420 A.2d 809, 815 (R.I. 1980).
Involuntary manslaughter in Rhode Island is defined as "an unintentional homicide without malice aforethought committed either in performance of an unlawful act not amounting to a felony or in the performance of a lawful act with criminal negligence." State v. Hallenbeck, 878 A.2d 992, 1008 (R.I. 2005); see State v. Lillibridge, 454 A.2d 237, 240 (R.I. 1982). This definition clearly creates two distinct theories of involuntary manslaughter: one based on criminal negligence theory and one based on unlawful act theory ("misdemeanor manslaughter"). Although the Rhode Island Supreme Court has repeatedly recognized this definition, there are few cases discussing the specific nature of the unlawful act theory of manslaughter. See, e.g., State v. Pedro Ortiz,824 A.2d 473, 485 (R.I. 2003); State v. Wilding, 740 A.2d 1235, 1240
(R.I. 1999); State v. Hockenhull, 525 A.2d 926, 929 (R.I. 1987); State v. Freeman, 473 A.2d 1149, 1151 (R.I. 1984);State v. Kaner, 463 A.2d 1348, 1351 (R.I. 1983). The most instructive misdemeanor manslaughter discussion is found inState v. McLaughlin, 621 A.2d 170, 177 (R.I. 1993). InMcLaughlin, the Rhode Island Supreme Court articulated the two elements that comprise misdemeanor manslaughter. Id. The State "must show first that a misdemeanor occurred and then that such misdemeanor was the proximate cause of the victim's death." Id.McLaughlin was the first Rhode Island case to limit the unlawful act to misdemeanors; it also was the first case to specify that the unlawful act must proximately cause the death.Id.
 SUMMARY OF DEFENDANT'S ARGUMENTS
Defendant first claims that the State failed to allege the Defendant engaged in conduct that constitutes a misdemeanor under Rhode Island law. Defendant also argues § 11-13-1 does not apply to pyrotechnics. Further, Defendant contends § 11-13-1 failed to give adequate warning of the offense, in violation of due process protection. Defendant asserts that the firework misdemeanor's thirty-day statute of limitation precludes the State from bringing a manslaughter charge after thirty-days.[5]
Defendant contends that even if the ignition of the pyrotechnics constituted a misdemeanor under § 11-13-1, manslaughter could not be appropriately charged because the Defendant lacked the criminal scienter necessary for such a serious conviction. Defendant avers Rhode Island case law requires the misdemeanor underlying a misdemeanor manslaughter charge to be malum in se, and contends the firework statute ismalum prohibitum. Additionally, Defendant argues that the indictment requires no criminal mens rea in violation of fundamental due process guarantees and State case law. Finally, Defendant joins his Co-Defendants, Jeffrey and Michael Derderian, in alleging prosecutorial misconduct infected the grand jury trial. See State v. Derderian, K1-03-654 A., K1-03-655A (R.I.Super. Dec. 5, 2005).
 STATE'S OBJECTION
The State asserts the clear language of the statute indicates the pyrotechnic devices used by the Defendant required a permit or prior approval under § 11-13-1 ("firework statute"). Further, the State argues that a reasonable person would know that the Defendant's conduct was within the ambit of the firework statute. The State avers the thirty-day statute of limitation for the firework misdemeanor is irrelevant, as the State does not seek to bring charges under the firework statute. Finally, the State contends that there is an element of criminal mens rea imbedded both in the misdemeanor and in the proximate cause required between the misdemeanor and the deaths. Thus, the State asserts that the level of criminal culpability embedded in the misdemeanor manslaughter counts is sufficient to satisfy due process guaranties and is also consistent with Rhode Island case law.
 STATE ADEQUATELY ALLEGED THE DEFENDANT COMMITTED A MISDEMEANOR
Pyrotechnic Devises Included in § 11-13-1
The question of whether pyrotechnic gerbs fall within the ambit of the firework statute is one of statutory interpretation.[6] Section 11-13-1 reads:
 "Sale, use or possession of fireworks — (a) No person shall . . . possess or have under his or her control, use or explode, or cause to explode for exhibition or amusement any fireworks D.O.T. Class "B" or "C" (which term for the purposes of this section is defined and declared to be any combustible or explosive composition, or any substance or combination of substances or article prepared for the purpose of producing a visible or audible effect by combustion, explosion, deflagration or detonation . . .) . . . except that permits for use of D.O.T. Class "B" or "C" fireworks for commercial display may be issued in accordance with provisions of the Rhode Island Fire Safety Code, chapters 28.1-28.39 of title 23. . . . Fireworks display by any . . . group of individuals is permitted, on condition that the display shall be made by a competent operator approved by the local fire authority and shall be of such character as in the opinion of the fire authority will not be hazardous to persons or property. . . . (b) Any person . . . using or having in his or her possession without a permit with intent to use D.O.T. Class "C" fireworks with a value of under five hundred dollars ($500) shall be guilty of a misdemeanor and shall upon conviction be fined not exceeding five hundred dollars ($500) for each offense and/or imprisoned for not more than one year for each offense."
The pyrotechnic gerbs allegedly used by the Defendant fit the definition of "fireworks" stated in this section as "any
combustible or explosive composition, or any substance or combination of substances or article prepared for the purpose of producing a visible or audible effect by combustion, explosion, deflagration or detonation." Section 11-13-1(a) (emphasis added).
Defendant admits "[t]his language, considered in isolation, could fairly be argued to include pyrotechnics." (Dismiss 14.) However, the Defendant urges the Court to consider how the Rhode Island Fire Safety Code, referenced within the firework statute, defines "fireworks." (Dismiss 14-15.) Defendant correctly indicates the Fire Safety Code refers to pyrotechnics and fireworks separately. See § 23-28.11-3 through § 23-28.11-10. Specifically, the statute under which the Defendant could have obtained a permit makes this distinction, stating:
 "Permits. — (a) Permits to possess and display commercial fireworks or pyrotechnics shall be issued by the local fire authority on forms provided by the state fire marshal.
 (b) No permit to possess and display fireworks or pyrotechnics shall be issued by the local fire authority until the applicant has first obtained a valid certificate of competency from the state fire marshal. For purposes of this chapter, "pyrotechnics" means a chemical mixture, including pyrotech-compositions, intended to produce a visible and/or audible effect by combustion, deflagration or detonation before a proximate audience closer than allowed for outdoor fireworks displays as permitted under this chapter. All pyrotechnics shall be in accordance with the requirements of the National Fire Protection Standard 1126, entitled `Use of Pyrotechnics Before a Proximate Audience', 1992 Edition, and the requirements of this chapter." § 23-28.11-3 (1997) (emphasis added).
Essentially, the Defendant asserts that if the Fire Safety Code defines fireworks and pyrotechnics separately, than pyrotechnics cannot be included as a type of firework under the firework statute.
What the Defendant fails to adequately consider is that "fireworks" is defined in the firework statute for purposes of that section only, and "pyrotechnics" is defined within the permit statute for purposes of that section only. Section 11-13-1
("fireworks D.O.T. Class "B" or "C" (which for purposes of this chapter is defined and declared to be . . .")); Section 23.28-11.3 ("For purposes of this chapter, "pyrotechnics" means . . .). As each section specifies the scope of the devices included in the section, the reasonable person can readily determine the conduct to which each section refers.
When a statute has a "plain, clear, and unambiguous meaning, no judicial interpretation is required, and the words will be given full effect in accordance with the plain, expressed intent."State Department of Corrections v. Rhode Island State LaborRelations Bd., 703 A.2d 1095, 1097 (R.I. 1997); see Local400, International Federation of Technical and ProfessionalEngineers v. Rhode Island State Labor Relations Bd.,747 A.2d 1002, 1004 (R.I. 2000). "[I]n enacting a statute the Legislature is presumed to have intended that every word, sentence, or provision has some useful purpose and will have some force and effect." State v. Benoit, 650 A.2d 1230, 1232 (R.I. 1994) (citing State v. Reis, 430 A.2d 749, 752 (R.I. 1981)). When statutes are ambiguous, the court must examine the statutes in "their entirety, and will `glean the intent and purpose of the Legislature "from a consideration of the entire statute, keeping in mind the nature, object, language and arrangement'" of the provisions to be construed." State v. Oliveira, 882 A.2d 1097,1110 (R.I. 2005) (citations omitted).
The statutes in question are unambiguous, as the definition of fireworks in § 11-13-1 clearly includes pyrotechnic gerbs. Although the Court is mindful that a penal statute must be liberally construed in favor of the accused, the Defendant does not assert a viable interpretation of the statute. It is prudent that the Fire Safety Code would define pyrotechnics more specifically as to better tailor requirements to the specific type of device.[7] There is no conflict between two statutes that define a term differently for purposes of each of the statutes. Further, the purpose of the Legislation was clearly to prohibit unsupervised handling of firework displays, including pyrotechnics, to help prevent the danger associated with mishandling these sorts of devices. The Defendant's interpretation of the statute would contradict this purpose, as it would prevent prosecution of unlawful possession and use of pyrotechnic devices under § 11-13-1.
Section 11-13-1 Gives Reasonable Notice as to the ConductProhibited
"Basic due process provides that no man shall be held criminally responsible for conduct that he could not reasonably understand to be proscribed." State v. Ibbison, 448 A.2d 728,733 (R.I. 1982) (quoting United States v. Harriss,347 U.S. 612, 617 (1954)). A criminal statue "must contain a description or definition of the act or conduct which comprises the offense contemplated therein stated with legal certainty." Oliveira,882 A.2d 1097, 1110; State v. Brown, 97 R.I. 115, 119,196 A.2d 133, 136 (1963). "The standard employed to gauge whether a particular statutory term reasonably informs an individual of the criminality of his conduct is whether the disputed verbiage provides adequate warning to a person of ordinary intelligence that his conduct is illegal by common understanding and practice." State v. Fonseca, 670 A.2d 1237, 1239 (R.I. 1996) (citing State v. Authelet, 120 R.I. 42, 45, 385 A.2d 642, 644
(1978)).
Mindful of these principles, the Court finds no merit in the Defendant's contention that § 11-13-1 fails to alert the reasonable individual that pyrotechnic use is prohibited unless approval or permit is first procured. The reference to the Fire Safety Code allows individuals to ascertain how to comply with the code; the permit statute specifies to whom the permit must be applied and also specifies that a test must be completed in order to obtain the certificate of competency necessary to receive such a permit. Section 23-28.11-4. The Fire Safety Code also specifies that examination may be denied to any person who has been convicted of a common law crime, falsified information on the application, or has violated certain fire regulations. Section23-28.11-6. The Code states that issuance of a permit requires $50,000 of insurance, and a requirement that non-residents must appoint a member of the bar to receive process in the event of a lawsuit. Section 23-28.11-7; § 23-28.11-8.
Not only is the regulatory scheme of the firework statutes clear, the duty to obtain a permit before use of fireworks is rooted in Rhode Island history. See G.L. 1909 § 15-134-4.[8] Such regulation is designed to guard against misuse of such devices, as the court has recognized the danger fireworks present when adequate safety measures are not followed.See Sroka v. Halliday, 39 R.I. 119, 134, 97 A. 965, 971
(1916) ("It is beyond question that one engaged in handling firearms or fireworks and other dangerous explosives must exercise a degree of care commensurate with the danger involved."); Hassett v. Thurston, 43 R.I. 47, 51, 110 A. 394,396 (1920) (Danger may . . . arise from the handling of fireworks in a careless or imprudent manner."). The clarity of the legislation and the history of regulating fireworks would put the reasonable person on notice that compliance with State regulations should precede use of fireworks and pyrotechnics.
Thirty-day Statute of Limitation Irrelevant to Manslaughter
Section 11-13-2 requires all prosecutions of the firework statue to be brought within thirty days.[9] The Defendant asserts § 11-13-2 renders the indictment invalid, as the manslaughter charges were brought substantially past the thirty-day limitation. (Dismiss 23.) As the State persuasively responds, the only important statute of limitations would be the one that applies to the crime with which the Defendant is charged, manslaughter. Allowing the underlying misdemeanor's limitation period to essentially replace the specified homicide time limitation would be contrary to the clear legislative mandate that homicide has no time limitation. Section 12-12-17.
The State is not charging the Defendant with the firework misdemeanor; rather, the significance of the misdemeanor is that misdemeanor manslaughter requires the death to be proximately caused by the unlawful act. The expiration of the thirty-day period made the misdemeanor no less unlawful. Other states have ruled analogously when considering the felony murder rule. See,e.g., State v. Jones, 553 S.E.2d 612, 614-615 (Ga. 2001) ("Foreign jurisdictions which have considered the issue before us have uniformly held on that `the running of the statute of limitations on the underlying felony is irrelevant to a prosecution for felony murder.'" (citations omitted)); Jacksonv. State, 513 So. 2d 1093 (Fla.Dist.Ct.App. 1987) ("The mere preclusion of the state's capacity to prosecute the subordinate crime because of a time limitation has no effect upon the question of whether such a crime was committed."); see alsoState v. Lacy, 929 P.2d 1288, 1298 (Ariz. 1996); State v.Dennison, 801 P.2d 193, 202 (Wash. 1990). Therefore, the State has adequately alleged the Defendant's conduct constituted a misdemeanor under Rhode Island law.
Culpability of Firework Misdemeanor
The State must first prove some criminal mens rea on the part of the Defendant in the possession, control, and ignition of the pyrotechnic devises. Although the statute on its face does not require any mental culpability, a criminal statute prohibiting possession of a specified object has repeatedly been held to require both intentional control of the object and knowledge of the object's nature. State v. Kaba, 798 A.2d 383, 392 (R.I. 2002); State v. Gilman, 110 R.I. 207, 215, 291 A.2d 425, 430
(1972). This holding has applied to many different criminal statutes.[10] Such knowledge can be inferred from the acts, declarations, or conduct of the accused. State v. Colbert,549 A.2d 1021, 1024 (R.I. 1988).
As the State recognized in oral argument (Hr'g Tr. 56), the rule to strictly construe verbs relating to possession in criminal statutes extends to the misdemeanor underlying the Defendant's indictment. Essentially, in order to prove the underlying misdemeanor, the State will not only have to prove the Defendant's possession and use of the pyrotechnics without a permit, but also must prove the Defendant intentionally controlled the pyrotechnics and knew of the characteristics of the devices. This is not to say the State will have to prove that the Defendant knew his conduct was illegal, but rather that the Defendant knew he was dealing with devices which had a combustible or explosive composition or that contained a substance prepared for the purpose of producing a visible or audible effect by combustion, explosion, deflagration, or detonation. See Section 11-13-1.
 STATE ADEQUATELY ALLEGED DEFENDANT COMMITED MISDEMEANOR MANSLAUGHTER
Whether the unlawful possession, control, and ignition of pyrotechnic gerbs could potentially serve as the requisite misdemeanor for a manslaughter conviction is a novel question in Rhode Island. The Court agrees with the Defendant's suggestion that without some element of mens rea, conviction of the Defendant would be inconsistent with both Rhode Island law and State and Federal Constitutional guarantees. However, the Court does not agree that the indictment as it stands does not require any underlying criminal mens rea; further, the Court holds that the criminal culpability required to convict the Defendant is consistent with state law and constitutional protections.
The allegation of manslaughter based on the firework misdemeanor is consistent with state law and constitutional protections. "To inflict substantial punishment upon one who is morally entirely innocent, who caused injury through reasonable mistake or pure accident, would so outrage the feelings of the community as to nullify its own enforcement." Sayre, PublicWelfare Offenses, 33 Col. L. Rev. 55, 56 as in Morissette v.United States, 342 U.S. 246, 256 (1952). As manslaughter carries substantial punishment of up to thirty years, it would be unjust to convict the Defendant unless the Defendant had some guilty mental state.[11] However, in addition to the knowledge implied in the misdemeanor, there is also criminal culpability embedded in the misdemeanor manslaughter theory of involuntary manslaughter.
In State v. McLaughlin, the Rhode Island Supreme Court articulated that proximate cause is an element of the crime of misdemeanor manslaughter. 621 A.2d 170 (R.I. 1993). InMcLaughlin, the Court stated "[i]n order to find defendant guilty of involuntary manslaughter under the misdemeanor manslaughter theory, the state must prove two elements beyond a reasonable doubt. It must show first that a misdemeanor occurred and then that such misdemeanor was the proximate cause of the victim's death." Id. at 177 (emphasis added). AlthoughMcLaughlin was not decided on misdemeanor manslaughter grounds, the Rhode Island Supreme Court's discussion of misdemeanor manslaughter is enlightening and persuasive; it is both consistent with current criminal law reasoning in Rhode Island and is also the only recent Supreme Court discussion regarding the limitations of misdemeanor manslaughter.
Proximate Cause Requirement of Misdemeanor ManslaughterHeightens Culpability Required to Convict the Defendant.
The requirement that the illegal conduct proximately cause the manslaughter eliminates concerns that the culpability required to convict the Defendant is too insignificant to uphold a manslaughter conviction. Logically, the Defendant's conduct must be of the type that could proximately cause death. LaFave'sSubstantive Criminal Law identifies how states have limited the use of misdemeanor manslaughter through proximate cause. Section 15.5(c) at 803-806 (2d ed. 2003).[12] States which adhere to the malum in se/malum prohibitum distinction generally do not require proof of proximate cause if the misdemeanor is malumin se. Id. Those states would apply the three variations of limiting the underlying misdemeanor to malum prohibitum crimes; other states would use the variations as to all crimes.[13]
The three variations are 1) the unlawful act must proximately cause the death, 2) the unlawful excess must proximately cause the death, or 3) the unlawful act must amount to criminal negligence. Id. The Court in McLaughlin adopted the first position, as it states the criminal conduct must proximately cause the death. Further, no distinction was made in the opinion between malum prohibitum/malum in se misdemeanors. Moreover, manslaughter resulting from criminal negligence is clearly a separate theory of manslaughter in Rhode Island. See State v.Wilding, 740 A.2d at 1235, 1240 (R.I. 1999); McLaughlin,621 A.2d 170, 177. In explaining how proximate cause limits the use of misdemeanors, LaFave states:
 "[Defendant] is not guilty unless the death which occurs is the foreseeable or natural consequence of the defendant's unlawful conduct . . . it is not necessary that death to this particular victim, occurring in this particular manner, be foreseeable; it is enough that the victim be a member of an endangered class, and that his death come about in a foreseeable, rather than an extraordinary, way. Section 15.5(c) at 804.
The proximate cause limitation is perfectly consistent with the Rhode Island Supreme Court's reasoning in other criminal cases. In State v. Benoit, the defendant, while intoxicated beyond twice the legal limit, was driving in the high-speed lane.650 A.2d 1230, 1231 (R.I. 1995). A car carrying one passenger, driving in the opposite direction of the defendant, crossed the dividing line and hit the defendant. Id. The passenger in the other car was killed, and the driver of the other car was injured. Id. The defendant was charged by way of information with § 31-27-2.2 and § 31-27-2.6.[14] Id. at 1230-1231. These statutes appeared to create a strict liability standard if an intoxicated defendant was operating a vehicle and death or injury resulted from such operation. Plainly, the operation of the vehicle was a "but for" cause of the accident; without the defendant's presence on the highway, no accident would have occurred. However, the Court held proof that the manner of operation proximately caused the death was necessary. Id. at 1234. In terms of proximate cause, the simple fact that the defendant was intoxicated while driving did not make it foreseeable that a car traveling at a high rate of speed would cross the center divider and strike the defendant's car. Because the State admitted that it could not prove the defendant's truck was anywhere but in its lane and only alleged the mere presence of the car on the highway, the Court dismissed the counts.Benoit, 650 A.2d at 1234. The Court rejected the State's theory of strict liability and embraced the limitation that proximate cause must be shown between the manner of operation and not just the operation itself. Id. at 1233-1234.[15] The Court also clarified that no showing of negligence or recklessness was necessary to convict the defendant under the two statutes. Id. at 1233. Sensibly, a harmless misdemeanor could not serve as the proximate cause of a death because death is not the natural consequence of harmless action.
Proximate Cause Inquiry is Fact-Intensive
With respect to the proximate cause inquiry, State v. Benoit
is also significant because of the Court's focus on the facts of the case, not the general category of the crime. Drunk driving is a crime that the court blatantly considered to be conduct that proximately causes death. Id. 1232. ("We note that the amount of human carnage resulting from alcohol-related motor vehicle accidents is horrific.") However, the Court did not consider whether the category in which the conduct was classified could proximately cause the crime, but rather looked to see if defendant's specific actions proximately caused the crime. Similarly, when a defendant is charged with second-degree murder based on a death resulting in the commission of a non-enumerated felony, the Rhode Island Supreme Court looks to the manner in which the crime is committed. When considering if the non-enumerated felony could underlie a second-degree murder conviction, the Court stated that
 "the better approach is for the trier of fact to consider the facts and circumstances of the particular case to determine if such felony was inherently dangerous in the manner and the circumstances in which it was committed, rather than have a court make the determination by viewing the elements of a felony in the abstract. . . . A number of felonies at first glance would not appear to present an inherent danger to human life but may in fact be committed in such a manner as to be inherently dangerous." State v. Stewart, 663 A.2d 912, 919 (R.I. 1995).
The Defendant's contention that malum prohibitum crimes should be categorically excluded without inquiry into the specific facts would be contradictory to previous reasoning of the Rhode Island Supreme Court. The inquiry of this Court should not be whether a firework misdemeanor can underlie a misdemeanor manslaughter conviction, but whether the Defendant's alleged unlawful possession, control, and ignition of the pyrotechnics, in light of the specific circumstances and facts, could create a foreseeable risk of death. Although the Defendant had a duty under the statute to refrain from possession, control, and ignition of pyrotechnics without a permit, failing to do so does not automatically mean his conduct made death foreseeable. The alleged facts indicate that conditions in The Station nightclub might have been unusually dangerous, possibly constituting an intervening cause of death. Depending on the facts and circumstances, the effect of the pyrotechnics may not have been foreseeable. However, proximate cause and knowledge are facts for the jury to decide and are not appropriate for this Court to address in a motion to dismiss counts in an indictment.
Proximate Cause Requirement Sufficiently Invokes CriminalCulpability Consistent with Rhode Island Case Law andConstitutional Considerations
Although this Court believes strict liability for manslaughter would raise constitutional concerns, the State is not alleging strict liability. The United States Supreme Court has stated "[a] relation between some mental element and punishment for a harmful act" is inherent in the criminal law tradition.Morrisette v. United States, 342 U.S. 246, 250-251 (1952) (emphasis added). Rhode Island cases law does support the argument against strict criminal liability for serious crimes.See, State v. Tobin, 602 A.2s 528 (R.I. 1992); State v.Gilman, 291 A.2d 425, 430 (R.I. 1972). However, no Rhode Island case supports the Defendant's contention that the counts should require greater culpability than previously discussed. Defendant specifically alleges (Dismiss 7-8) the reasoning in State v.Tobin requires the court to dismiss the misdemeanor manslaughter counts against the Defendant. 602 A.2d 528 (R.I. 1992). InTobin, the Rhode Island Supreme Court ruled that proof of sexual contact alone could not support a second-degree sexual assault conviction, but rather the State must also show that the contact was for the defendant's purpose of sexual gratification.Id. at 535.
The Court initially notes that reasoning in Tobin applied to strict liability crimes. As noted above, the State does not seek to hold the Defendant strictly liable. Further, sexual assault is a crime of specific intent. Clearly, misdemeanor manslaughter is not a crime of specific intent; if the Defendant had specifically intended to harm or kill the victims in this case, he would be charged with the greater crime of murder. Beyond these distinctions, the Rhode Island Supreme Court has already rejected the extension of Tobin in State v. Yanez. 716 A.2d 759 (R.I. 1998). In this statutory rape case, the Yanez Court firmly rejected the defendant's argument that Tobin should be interpreted to mandate mens rea as to the age of the victim.Id. at 769. The Rhode Island Supreme Court chose to construe the reasoning of Tobin narrowly.[16]
No Additional Elements Applicable
This Court believes that the indictment sufficiently meets the modern day requirements of misdemeanor manslaughter articulated in McLaughlin.[17] Because McLaughlin and other recent Rhode Island criminal law cases fail to adhere to the malum inse/malum prohibitum distinction, this Court does not believe it is necessary or appropriate to add any additional requirements to the crime of misdemeanor manslaughter. Proximate cause implicates a culpable mental state; a separate element for criminal culpability is not required.
Defendant further argues State v. De Fonti, 34 R.I. 51,82 A. 722 (1912) requires the Court to add a separate malum in se
element to the manslaughter crime. (Letter Rebuttal.) However,De Fonti is simply an early case from which the modern concept of criminal mental culpability has evolved. The Court initially notes that De Fonti is now nearly ninety years old and took place during a legally and factually different era. Nevertheless, the Court is also mindful that a case should not be rejected merely because of its age, as many cases become even more authoritative because they have withstood the test of time.State v. Edwards, 810 A.2d 226, 236 (R.I. 2002) (E.g.,Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L. Ed. 60
(1803)). Unlike many time-tested historical cases, the Supreme Court has never cited De Fonti in the ninety-plus years since the court handed down the opinion. When the Supreme Court considers previous cases, a single case may have compelling force but courts are generally more constrained to follow a rule of law that has been declared by a series of decisions rather than by one standing alone. St. Germain v. Lapp, 72 R.I. 42, 51,48 A.2d 181 (1946). However, this Court has no intention of purporting to overrule the holding and direct reasoning of DeFonti. When the language of De Fonti is read within its historical context, the opinion's thrust is directly consistent with this decision.
De Fonti is a short rescript in response to four certified questions. The defendants in De Fonti were charged with common law manslaughter in separate cases, both for selling liquor mingled with wood alcohol, a deadly substance.[18] Id. at 52-53, 722-723. In both cases, the victims died as a result of drinking what was supposed to be whiskey, ordered from the separate defendants. Id. at 54-55, 724. The Superior Court asked for clarification as to what particular facts must be included in the indictment for negligent manslaughter and unlawful act manslaughter.[19] Id. at 54-55, 722-23. The relevant holding of De Fonti was that manslaughter based on the sale of wood alcohol requires the State to prove the defendant had knowledge of the poison; this ruling was later codified.[20] The court cited the doctrine that "[b]y the innocent administration of poison no penal law is violated, no moral turpitude is shown. To hang a man for such a mistake, or incarcerate him for life, is a barbarity not inflicted by the law of any civilized and enlightened people." Id. at 56, 724. (citing Moynihan v. State, 70 Ind. 126, 130 (1880)). This underlying reasoning that some criminal mens rea must underlie a homicide conviction has already been recognized by this Court and is supported by other binding precedents.
The De Fonti Court discusses a few hypothetical situations classifying some crimes as malum prohibitum and malum in se,
to provide illustrations of how accidental behavior should not be punished by misdemeanor manslaughter. Id. at 55-57, 724. It is these hypothetical situations that the Defendant hopes to analogize with his own situation. The De Fonti Court states the unlicensed practice of medicine and unlicensed shooting of a gun are malum prohibitum and unavailable for manslaughter conviction if death resulted. Id. at 724. This dicta is best understood in the light of the times, as shooting a gun and practicing medicine were not considered to be the dangerous enterprises recognized by modern day society.[21] Just fourteen years later, the Supreme Court stated that "[m]anslaughter may consist, among other things, of doing an unlawful act resulting in unintentional killing, such as violation of motor vehicle laws or administration of drugs to procure an abortion." State v. McVay, 47 R.I. 292, 295,132 A. 436, 438-439 (1926). As society's sophistication has increased, the need and recognition of safety-oriented legislation has become significantly more important. Therefore, De Fonti's use of these hypothetical examples must be viewed as illustrating behavior that at the time was considered to be morally blameless. Now such behavior is considered to be more dangerous.
Initially inquiring whether a misdemeanor is malum prohibitum
or malum in se on its face is simply neither required by Rhode Island law nor is it consistent with modern-day criminal law reasoning. When considering whether to suspend a retiree's pension, the Supreme Court of Rhode Island stated:
 "It may well be true . . . that Romano `committed no evil' when he feathered his retirement nest with over $100,000 in illegal public retirement benefits. But whenever possible, we prefer to leave judgments about the good or evil that men do to a much higher and infinitely more prescient court than this one. What we do know, however, is that Romano's deft `double dipping' was contrary to state law. And whether his conduct in arranging to receive this money is labeled good or evil, malum in se or malum prohibitum, the fact remains that, at the end of the day, he not only sought but also obtained tens of thousands of dollars in publicly funded retirement benefits that he was not entitled to receive. Thus, his moral culpability in securing this illicit pension lucre is irrelevant to our legal condemnation of his actions. We hasten to add, however, that his behavior in obtaining and maintaining this illegal stream of pension bounty was hardly blameless. Thus, the dissent's heartfelt identification with Romano's pension plight tends to ignore or, at the very least, to minimize the extent to which Romano himself was responsible for obtaining these ill-gotten gains, and to undervalue the public benefit of recovering this money for the system to use in paying legitimate pension benefits to other retirees." Romano v. Retirement Bd. Of the Employees' Retirement Sys., 767 A.2d 35, 38-39 n. 3 (R.I. 2001).
Although Romano v. Retirement Bd. is not a criminal case, it illustrates how the malum in se concept is viewed by the Rhode Island Supreme Court. Other jurisdictions and scholars alike have recognized the outdated nature of the classification.[22]
Classification of the alleged firework misdemeanor as malum inse or malum prohibitum is unnecessary. If the State can prove the Defendant disregarded the statutory requirements for possession and use of the pyrotechnic devices, and that disregard caused a foreseeable risk of death to hundreds of people, the Defendant's conduct would not be blameless. However, if the facts show that such disregard did not exist or did not create a foreseeable risk of death, then the Defendant could not be convicted of manslaughter.
This Court declines to dismiss the misdemeanor manslaughter counts on their face by promulgating a new judicial rule creating categorical limitations on the type of misdemeanor the State could use as the basis of a manslaughter charge.[23] As this issue has not been presented to the Supreme Court of Rhode Island, it would be their prerogative to use these facts to further limit misdemeanor manslaughter if the court was so inclined. This Court notes that misdemeanor manslaughter has fallen into disfavor on a national level, and has been criticized as being harsh and archaic. However, it remains a viable cause of action in this jurisdiction. The Court leaves any further review and or limitation to the Supreme Court of Rhode Island.
 GRAND JURY PROCEEDING
Defendant lastly adopts the arguments of his Co-defendants, attacking the grand jury trial.[24] Defendant asserts that the prosecution's failure to present allegedly exculpatory evidence in response to a grand juror request constitutes prosecutor misconduct that requires dismissal. The Court rejects this argument as there is no duty to present exculpatory evidence to the grand jury, and a broad question from a grand juror for exculpatory evidence does not create an additional duty to present such evidence. The Court further rejects the Defendant's argument because the evidence was not clearly exculpatory and the prosecution's response to the grand juror's question did not rise to the level of deceit or purposeful concealment. Finally, the Court rejects the Defendant's argument because the Defendant was not prejudiced by the prosecution's failure to present the evidence to the grand jury, as it had already had been substantially presented through other testimony.
Rhode Island maintains a traditional view of the grand jury process, holding the secrecy surrounding the grand jury process and the ultimate decision of the grand jury with high regard.[25] "The grand jury has always occupied a high place as an instrument of justice in our system of criminal law."John Doe Grand Jury Proceedings, 717 A.2d 1129, 1134 (R.I. 1998). It is the position of the Supreme Court of Rhode Island that
 "`[i]n this country, as in England of old the grand jury has convened as a body of laymen, free from technical rules,' a group of individuals who are `free to make their presentments or indictments on such information as they deemed satisfactory.' Rhode Island, unlike some jurisdictions, has continued to adhere to the traditional grand jury model. This Court has declined to micro-manage grand jury procedures in the past, and we decline defendant's invitation to do so at this time." State v. Franco, 750 A.2d 415, 419 (R.I. 2000) (quoting Costello v. United States, 350 U.S. 359, 362 (1956)).
As such, "a trial justice should honor an indictment returned by a legally constituted grand jury and trial in the Superior Court should proceed thereon." State v. DiPrete, 682 A.2d 1373, 1375
(R.I. 1996). Rhode Island follows the United States Supreme Court's position that "an indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for a trial on the merits." State v. Romano, 456 A.2d 746, 753 (R.I. 1983) (citing Costello v. United States, 350 U.S. 359, 363
(1956)).
The grand jury serves the two interrelated functions of investigating and indicting. State v. Guido, 698 A.2d 729, 735
(R.I. 1997).[26] Grand jury proceedings are considered to be one-sided affairs that afford prosecutors great latitude in their comments. State v. Mainelli, 543 A.2d 1311 (R.I. 1988). "[I]t has traditionally been the function of the grand jury to decide whether the evidence presented to it, unexplained and uncontradicted, gives rise to sufficient quantum of proof to warrant the return of a formal accusation of crime." State v.Acquisto, 463 A.2d 122, 126 (R.I. 1983). One of the reasons for such deference is the recognition that
 "If indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merit a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. This is not required by the Fifth Amendment." Acquisto, 463 A.2d at 127
(quoting Costello v. United States, 350 U.S. 359, 363 (1956).
It is true that "[d]ue process rights include a guarantee of impartiality that is as applicable to grand-jury deliberations as it is to petit-jury deliberations." Romano, 456 A.2d at 750. However, "[f]or prosecutorial misconduct to constitute a due-process violation, it must be `of sufficient significance to result in the denial of the defendant's right to a fair trial.'"Bustamante v. Wall, 866 A.2d 516, 525 (R.I. 2005) (citingGreer v. Miller, 483 U.S. 756, 765 (1987)). In order for this Court to dismiss the indictment based on a defect in the grand jury proceeding, there would have to be extreme circumstances.See State v. Romano, 456 A.2d 746, 750 (R.I. 1983).
Barry Warner's Anonymous Fax
On May 28, 2003, prosecutors received an anonymous fax regarding the practices of American Foam Company, the company from which the nightclub owners allegedly purchased the foam ("Fax"). The Fax accuses the company's president and associates of poor character in their personal lives and also asserts the company had a policy of providing their customers with little information regarding their products. (See Fax). During a November 3, 2005 interview with Barry Warner (Warner Int. Tr.), a former employee of the American Foam Company, Warner admitted to authoring the Fax. (Warner In. Tr. 1-2). Warner previously testified before the Grand Jury on June 4, 2003. Defendant asserts that the State should have deduced that Warner wrote the Fax before the Grand Jury testimony, which would have allowed Warner to testify more extensively about American Foam Company's policies and also would have allowed the grand jurors to specifically question Warner regarding the Fax.
The Fax totals eight pages, including the cover page; only a page and a half of the Fax might be considered favorable to the Defendant. The Fax alleges American Foam Company was
 ". . . A COMPANY THAT IS WELL AWARE OF THE DANGERS OF POLY URETHANE FOAM.
 THIS IS A COMPANY THAT DID LITTLE TO EDUCATE THEIR EMPLOYEES ABOUT THE LIMITS OF POLYURETHANE FOAM. IN FACT, THEY DID THE OPPOSITE.
 THIS IS A COMPANY THAT DID NOT WANT TO LOSE A SALE BY TELLING THE TRUTH. BY BENDING THE TRUTH
 . . .
 `DON'T EDUCATE THE CUSTOMER, WAS OFTEN SPOKEN'
 . . .
 SOMEONE WHO SHOULD HAS [sic] BEEN EDUCATED BUT WAS NOT. NOT EDUCATED TO THE APPLICATION OF FOAM BEING SOLD TO A BUSINESS CALLED THE STATION.
 WHAT IS THE APPLICATION, THIS IS AN OFTEN ASKED QUESTION??? AT THE FOAM COMPANY, DID THEY ASK THE CALLER FROM THE STATION. WHAT IS THE APPLICATION? . . .
 . . .
 THEY ARE WELL AWARE IF A BUSINESS CALLS THEM UP TO PURCHASE CONVOLUTED FOAM, THAT IT IS BEING USED FOR A MATTRESS LINER, SOUND DEADENING, OR THE INSIDE OF A CASE FOR PACKAGING.
 THE FIRST TWO OF THE THREE OF THESE SHOULD BE NON FLAMMABLE FOAM." (Fax 6-7).
Essentially, the anonymous Fax might be construed to support the Defendant's assertion that the death was not a foreseeable consequence of the Defendant's actions. The Defendant argues deception or bad business practices of the foam company caused the club owners to buy the allegedly flammable foam, and that he reasonably relied on the club owners in his alleged belief that the premises were safe for pyrotechnic use. This information could be relevant to establish a defense that the flammability of the foam was an intervening cause, weakening the State's case that it was the Defendant's actions that proximately caused the death. Moreover, it is conceivable that the Defendant's alleged reasonable reliance is also relevant to the criminal negligence counts of involuntary manslaughter.
No Duty To Present Exculpatory Evidence
The Supreme Court of Rhode Island has repeatedly stated that "the dismissal of an indictment on grounds of prosecutorial misconduct is an extraordinary sanction reserved for very limited and extreme circumstances.'" Bustamante v. Wall, 866 A.2d 516,525 (R.I. 2005). The Rhode Island Supreme Court addressed the issue of exculpatory evidence in State v. Acquisto.463 A.2d 122 (R.I. 1983). In Acquisto, the Supreme Court declined to dismiss counts based on the prosecutor's refusal to present certain letters to the grand jury, despite the court's assumption that the letters were exculpatory. Id. at 127. The Court declined to exercise supervisory power to scrutinize the nature and quality of evidence presented to the grand jury, as it would run contrary to the whole history of the grand jury. Id. Ten years later, the Rhode Island Supreme Court echoed this sentiment, stating "Neither we nor the Supreme Court of the United States conduct minitrials to determine the adequacy of evidence presented to the grand jury. We do not require that evidence that may later be determined by counsel for the defense to be exculpatory must be presented to the grand jury on pain of dismissal of the indictment." State v. Ellis, 619 A.2d 418, 427
(R.I. 1993).
Rhode Island Superior Court Rule 3.3(d) of Professional Conduct
Defendant argues[27] that Rhode Island Superior Court Rule 3.3(d) of Professional Conduct creates a duty on the prosecution greater than imposed by the constitution. (See
Derderian Supp. Dismiss 7, n. 2). Rule 3.3 requires that in an ex parte proceeding, a lawyer shall inform the tribunal of all material facts, whether or not such material facts are adverse.[28] The Court initially notes that violation of the Rules of Professional conduct "should not be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such a legal duty." R.I. Super. Ct. R. Prof. Conduct, Art V. Thus, this Court is not mandated to enforce violations of the ethical rules through dismissal, as there are other mechanisms to enforce such rules.
In United States v. Williams, 504 U.S. 36 (1992), the Supreme Court held that the federal district courts have no inherent power to enforce a rule requiring a federal prosecutor to present substantial exculpatory evidence to a grand jury in light of the tradition of presenting only the prosecutor's side of the evidence. As stated supra, Rhode Island courts, like federal courts, adhere to the view that grand jury proceedings are one-sided affairs. Accordingly, this Court subscribes to the language of the United States Supreme Court:
 "Imposing upon the prosecutor a legal obligation to present exculpatory evidence in his possession would be incompatible with this system. If a balanced assessment of the entire matter is objective, surely the first thing to be done — rather than requiring the prosecutor to say what he knows in defense of the target of the investigation — is to entitle the target to tender his own defense. To require the former while denying (as we do) the latter would be quite absurd. It would also be quite pointless, since it would merely invite the target to circumnavigate the system by delivering his exculpatory evidence to the prosecutor, whereupon it would have to be passed on to the grand jury — unless the prosecutor is willing to take the chance that a court will not deem the evidence important enough to qualify for mandatory disclosure." United States v. Williams, 504 U.S. at 52.
The Rhode Island Supreme Court also looked to the reasoning ofWilliams when considering whether to dismiss an indictment where evidence before the grand jury was false, and prosecutors were aware of the inconsistencies when the testimony was presented. Ellis, 619 A.2d 418, 427 (1993). The Rhode Island Supreme Court quoted the Williams Court, stating that a district court "may not dismiss an otherwise valid indictment because the government failed to disclose to the grand jury `substantial exculpatory evidence' in its possession,'" as the grand jury is an accusatory rather than adjudicative body. Id.
(citing United States v. Williams, 504 U.S. 36 (1992)). Pursuant to case law in Rhode Island, which denies dismissal of an indictment except on exceptional grounds, and the history of not requiring the prosecution to present exculpatory evidence, as well as the purpose and effect of rules of professionial conduct, this Court rejects the Defendant's argument that Rule 3.3 creates a legal duty to present exculpatory evidence above that of the constitution.
Broad Question Presented No Additional Duty
Defendant contends that a grand juror question invoked additional duty to present exculpatory evidence. On November 19, 2003, a grand juror asked the prosecution if "there are any witnesses that you would know of that would bring us exculpatory information were we to call them?" (Couto Gr. Jry. Tr. 46.) In response to the question, the prosecution did not mention the Fax, and stated in what could be considered a stilted and convoluted fashion, that they could not characterize for the grand jury what information was inculpatory or exculpatory, but would call any witness who the grand jury thought would be exculpatory. (Couto Gr. Jry. Tr. 46-51.)
This Court rejects the contention that the initiative by a grand jury member to ask if any exculpatory witnesses existed invoked a duty to procure all evidence favorable to the Defendant. The grand jury certainly has the power to "compel the production of evidence or the testimony of witnesses as it considers appropriate." State v. Guido, 698 A.2d 729 (R.I. 1997). However, the question from the grand juror identified no particular witness that the prosecution could call. The Court need not decide to what extent a prosecutor must respond to a question from a grand juror. Surely the Court could not require this one-sided affair become a full-blown presentation of all evidence based on a broad question for exculpatory evidence by any one of the grand jurors.[29] To hold otherwise would improperly put the Court in the position of grand jury micro-management.
Answer to Grand Juror Question Does Not Rise to the Level ofMisconduct
Neither the Fax nor the subsequent interview with Warner, regarding the Fax, is exonerating. If the Fax is taken to be completely true, the question of whether the company's policy would be an intervening cause would still be one for the jury. Neither the Fax nor the subsequent interview with Warner revealed information regarding concealment; no specific company policy requiring or encouraging affirmative misrepresentation or deceit has been identified. (Warner Int. Tr. 9). Moreover, the supposed encouragement to refrain from informing the customer of product qualities was not specifically linked to flammability qualities. (Warner Int. Tr. 10-11). Finally, the credibility of both the Fax and the interview are both questionable, as Warner appears to be a former disgruntled employee who had admitted disagreements with the owner (Warner Int. Tr. 4) ("The owner is greedy . . . he needs to be taught a good lesson, not just his insurance company paying off for him.") Also, the testimony given by Warner in front of the grand jury was not substantially impeached by the Fax. As such, although the Fax may still be somewhat favorable to the Defendant, it is not substantially exculpatory.
When answering the grand juror question regarding exculpatory evidence, the prosecutors apparently viewed the word "exculpatory" narrowly, as to include evidence that would directly contradict evidence that they were presenting or evidence which would exonerate the Defendant. Although the prosecutor defined "exculpatory evidence" to include evidence that would tend to mitigate the wrongfulness of the act or exonerate or bear upon the innocence of the individual, it is clear from later qualification that prosecutors viewed exculpatory evidence as evidence that would directly contradict evidence the prosecutors were presenting. The prosecutors qualified the definition of exculpatory evidence, stating as follows:
 "[FERLAND] I'm unaware of anyone that's going to run in — and I'm not undermining your question at all, please don't take this the wrong way — I'm not aware of anyone who's going to run in and say, . . . I ignited the pyro, you know, Dan Biechele was in Iowa at the time. . . .
 [WHITE] [T]o characterize something as exculpatory is something that's fairly debatable. Does this telephone make me more likely to be guilty or less likely to be guilty? Different people may argue the — the merits of the particular position." (Couto Gr. Jr. Tr. 44-45.)
The prosecution did not state that no evidence or testimony from any source they had thus far received would be favorable to the Defendant. Rather, the State characterized the anonymous Fax, which contained evidence mildly favorable to the Defendant, as not clearly within the scope of exculpatory evidence as to warrant disclosure to the jury. This interpretation does not rise to the level of flagrant and overbearing misconduct by the prosecutor to warrant dismissal. DiPrete, 682 A.2d 1373, 1375. Thus, even if the Court were to hold that a jury question for exculpatory evidence required presentation of all substantial exculpatory evidence, which it does not, this evidence would not rise to a level of clearly exculpatory evidence. Nor does the prosecutors' conduct rise to the level of purposeful deceit. As such, the Defendant's constitutional rights were not violated by the grand jury procedure.
No Prejudice to the Defendant
Finally, the Court disagrees with the Defendant's assertion that he was prejudiced by the alleged prosecutor misconduct. "[D]ismissal of an indictment grounded on an alleged nonconstitutional error is proper only `if it is established that the violation substantially influenced the grand jury's decision to indict' or `if there is grave doubt that the decision to indict was free from substantial influence of such violations.'"State v. Franco, 750 A.2d 415, 418 (R.I. 2000) (quotingState v. Chiellini, 557 A.2d 1195, 1199 (R.I. 1999)). "Such a dismissal should be limited `to situations in which there has been flagrant prosecutorial misconduct accompanied by severe incurable prejudice.'" Bustamante v. Wall, 866 A.2d at 525
(citations omitted).
The Court notes that the nature of the Fax and subsequent testimony from Warner regarding the Fax does not present facts dramatically different than those presented to the grand jury trial. Neither Warner nor the president ever insinuated that the Company must have given the club owners information regarding the flammability of the foam. Aram DeMonoeulian ("DeMonoeulian"), the owner of American Foam Company, admitted the foam was probably not shipped with an information sheet (MSDS sheet), which would have indicated the flammable qualities, as such information sheets usually shipped only upon customer request. (Gr. Jr. Tr. 29, 37). DeMonoeulian further stated:
 "When a customer calls . . . and says do you have this type of foam, I want it for this purpose and then we go from there. . . . we have to get the info from the customer, you know. They have to tell us. We can't kinda know everything they're doing. When people buy, they come in and buy pieces of foam, they take it home. We don't quiz them. Is it for your dog or is it for yourself or is it for outside?" (DeMonoeulian Gr. J. Tr. 34.)
The Fax's allegation that the company had a policy of not informing the customer of the characteristics of their products is very similar to the owner's admission regarding the company's custom of providing limited information to the customer, unless the customer requested otherwise. The Court could not find the exclusion of the anonymous Fax and potential questions regarding the Fax to be gravely influential to the grand jury's decision because the relevant information in the Fax was already substantially presented to the grand jury. Any prosecutorial misconduct, although the Court perceives none, will be cured by a subsequent trial on the merits. Bustamante v. Wall,866 A.2d at 525.[30]
 CONCLUSION
For the foregoing reasons, the Court denies the Defendant's motion to dismiss any of the manslaughter counts contained in the indictment.
[1] The motion to dismiss actually states the basis as U.S. Const. amend. XV, instead of XIV. As U.S. Const. amend. XV
relates to the right to vote and the Defendants' argument relates to due process, the Court will take this as a typographical error.
[2] The State alleges that Great White hired the Defendant as "tour manager" in late 2002 for the "For You" Tour. According to the State, the job of "tour manager" includes duties such as arranging travel and hotel accommodations for the band and crew, coordinating press and personal appearances, and serving as de facto accountant for the band. The State further alleges that in the capacity as tour manager, the Defendant planned, procured, and executed pyrotechnic special effects accompanying select Great White musical performances. (State Bill of Particulars at 1-2; Objection 3-4).
[3] Defendant brings this motion in order to preserve the Defendant's right to raise this issue at a later time. SeeState v. McGuy, 841 A.2d 1109, 1115 (R.I. 2003). As both criminal negligence manslaughter and misdemeanor manslaughter are simply two theories of the same crime, neither conviction nor sentencing for both theories could stand. See State v. Doyon,416 A.2d 130, 133 (R.I. 1980). The State has recognized that such dual conviction would invoke constitutional protections.
[4] Defendant was indicted in the same grand jury proceeding as the nightclub owners, Jeffrey and Michael Derderian. See Statev. Derderian, No. K1-03-654A, K1-03-655A (R.I.Super.Ct. Dec. 5, 2005).
[5] Defendant originally alleged another ground for dismissal based on the reference to NFPA 1126 in G.L. 1956 § 23-28.11-3(b). The Defendant withdrew this argument when the State clarified that the misdemeanor manslaughter charge was not based on the section's reference to NFPA 1126. (Dismiss 18-22.) (Objection 22-24.) (Response 14-15.)
[6] The Court has already substantially addressed this issue when denying the Defendant's earlier request for subpoenas pursuant to R.I. Super. R. Crim. P. 17(c). See State v.Biechele, No. K1-03-653, 2005 R.I. LEXIS 155 (R.I.Super.Ct. October 21, 2005).
[7] For example, the Fire Safety Code specifies that pyrotechnics have the additional requirement of conformity with NFPA 1126. Section 23-28.11-3(b).
[8] "Every person who shall . . . enkindle or use . . . fire-works of a combustible nature ordinarily used for exhibition or amusement, unless he shall previously obtain special license from the town council of the town or the board of police commissioners, as the case may be, and for the purpose of exhibition on a suitable occasion, shall be fined ten dollars for each offence." G.L. 1909 § 15-134-4.
[9] "11-13-2. Limitation of prosecutions — Fines. — No complaint for a violation of any of the provisions of § 11-13-1
shall be sustained unless it shall be brought within thirty (30) days after the commission of the offense . . ."
[10] E.g. State v. Benevides, 425 A.2d 77 (R.I. 1981) (Conviction for carrying a firearm in a vehicle without a permit requires intentional control of the gun and knowledge the object was a gun); State v. Porto, 591 A.2d 791, 793 (R.I. 1991) (Conviction for possession of stolen goods requires guilty knowledge that goods were stolen); State v. Frederico Oritiz,609 A.2d 921 (R.I. 1992) (Conviction for possession of burglary tools with intent to commit a crime requires knowledge of tool's nature and control of tools); State v. Colbert, 549 A.2d 1021,1023-1024 (R.I. 1988) (Conviction for possession of marijuana with intent to deliver required knowledge that substance shipped in barrel was marijuana).
[11] Historically, the reasoning behind the misdemeanor manslaughter rule has been as follows:
 "In determining whether there is proof of conscious risk creation, a distinction must be drawn between unlawful and lawful acts resulting in homicide. The commission of an unlawful act is evidence of conscious risk creation. But a person engaged in performing lawful act is ordinarily not conscious of creating substantial and unjustifiable risk, and ordinarily, therefore, a greater degree of proof of conscious risk creation will be necessary." Bailey 
Rothblatt, Crimes of Violence: Homicide and Assault, § 585 (1973).
[12] When deciding the criminal negligence manslaughter question, the McLaughlin Court also consulted a LaFave treatise that provides the same analysis of misdemeanor manslaughter.See LaFave and Scott, Criminal Law (2d. 1986).
[13] Defendant admits that "most jurisdictions do not continue to employ a strict malum prohibitum/malum in se distinction as the prime limitation on misdemeanor manslaughter." (Response 2.)
[14] Section 31-27-2.2(a) provided in relevant part:
 "When the death of any person other than the operator ensues as a proximate result of an injury received by the operation of any vehicle, the operator of which is under the influence of, any intoxicating liquor . . . the person so operating such vehicle shall be guilty of `driving under the influence of liquor or drugs, resulting in death.'"
Section 31-27-2.6(a) provided in relevant part:
 "When serious bodily injury of any person other than the operator is caused by the operation of any motor vehicle, the operator of which is under the influence of any intoxicating liquor . . . the person so operating such vehicle shall be guilty of driving under the influence of liquor or drugs, resulting in serious bodily injury."
[15] It should be further noted that the Supreme Court did not require the State must prove the intoxication caused the accident; rather the State had to prove that the defendant's manner of operation proximately caused the death. If the Court had held that the intoxication itself must be the proximate cause of the death, Rhode Island would be employing view two of LaFave's limitations on misdemeanor manslaughter, which requires the illegal excess to cause the death. See LaFave, SubstantiveCriminal Law, § 15.5(c).
[16] Another indication that the Defendant's argument is unavailing is that felony-murder actively exists in Rhode Island.See State v. Stewart, 663 A.2d 912 (R.I. 1995) (permitting infant child to be a habitual sufferer for want of food or proper care was sufficient felonious conduct to support felony-murder conviction).
[17] The Court also rejects the Defendant's argument that one set of counts should be dismissed to prevent jury confusion, as the theories of manslaughter are similar. (Dismiss 10.) As the Rhode Island Supreme Court indicated presentment of both theories of involuntary manslaughter was proper in McLaughlin, this Court declines to make such presentation unavailable to the State. The Court further notes that the State's two theories of involuntary manslaughter are based on different facts. The misdemeanor manslaughter counts are based solely on the Defendant's actions in relationship to the pyrotechnic devises and statutory mandate. The criminal negligence involuntary manslaughter counts are based on the allegation that while performing the lawful act of serving as tour manager, Defendant was criminally negligent in failing to properly develop a stage plan, provide or check fire extinguishers, and other actions or inactions related to his tour manager role. (State's Bills of Particulars 2-3.)
[18] "Wood alcohol," also referred to as "methanol," "methyl alcohol," and "carbinol," can be deadly when ingesting as little as 30 ml. In the present day, it is used as an industrial solvent which may be found in antifreezes, gasoline, diesel oil, picnic stoves, torches, and is used as a solvent in the manufacture of vitamins, hormones, and other pharmaceuticals. The Merck Index:An Encylcopedia of Chemicals, Drugs, and Biologicals (12th
ed.)
[19] The higher standard of criminal negligence had not yet developed. It is unclear exactly why the sale of the whiskey was illegal, as the opinion fails to cite the statutory violation.
[20] See § 11-16-4 "Furnishing wood alcohol for beverage purposes"; § 21-30-4 "Sale or possession of wood alcohol with unlawful intent."
[21] In the present time, a non-physician who administered a controlled substance to an individual which resulted in death could be convicted of first degree murder under § 11-23-1, as delivery of a controlled substance is a specifically enumerated felony within the statute.
[22] See e.g., State v. Puryear, 590 P.2d 475, 479
(Ariz.Ct.App. 1979) ("While many early American decisions make the distinction in involuntary manslaughter cases between unlawful acts mala in se and those mala prohibita, the common law origins of this practice are dubious at best."); Commonwealth v.Samson, 196 A. 564, 567 (Pa.Super.Ct. 1938) ("There is a historical basis for the distinction between [malum in se and malum prohibitum] offenses, but modern decisions recognize little, if any, difference. . . . Their origin, as suggested by some writers, is probably ecclesiastical. . . . There was a sound basis for common law discrimination between acts malum in se and malum prohibitum, which does not prevail now . . .")
[23] The Court rejects the Defendant's suggestion that Rhode Island should adopt Massachusetts' limitation of misdemeanor manslaughter to assault and battery misdemeanors. There is no support for this adoption in Rhode Island law.
[24] It does not appear that the Defendant raises the issue of grand juror absence, perhaps because the grand juror who voted not to indict the Derderian Defendants, did vote to indict the Defendant, effectively making the most-absent of the twelve required jurors miss only one day of the grand jury presentation. The Court would have adopted its decision rejecting this argument as applied to the Defendant, if this issue had been raised. SeeState v. Derderian, K1-03-654A, K1-03-655A (R.I.Super.Ct. Dec. 5, 2005).
[25] Rhode Island joins a minority of states and the federal courts in adhering to the traditional view of grand juries, which does not require the prosecutor to present exculpatory evidence to the grand jury. Sara Sun Beale, et al., Grand Jury Law andPractice § 4:17, at 4-84 (2d ed. 2002).
[26] "In its indicting capacity, the grand jury is said to act as a shield, examining evidence to see whether there is `sufficient evidentiary support to justify holding the accused for trial on each charge' and thereby protecting the public from baseless prosecutorial accusations. In its investigating capacity the grand jury is said to act as a sword, ferreting out criminal conduct." Guido, 698 A.2d at 735. (citing 1 Sara Beale and William Bryson, Grand Jury Law and Practice § 1:07 at 35 (1986)). "Because [the grand jury's] task is to inquire into the existence of possible criminal conduct and to return only well-founded indictments, its investigative powers are necessarily broad. `It is a grand inquest, a body with power of investigation and inquisition, the scope of whose inquires is not to be limited by questions of propriety or forecasts of the probable result of investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime." Guido, 698 A.2d at 735 (quotingBranzburg v. Hayes, 408 U.S. 665, 668 (1972)).
[27] The Defendant adopted all arguments of Co-defendants Jeffrey and Michael Derderian (Supp. Motion 2.); the Court will address arguments that would be relevant to the Defendant's case as if the Defendant had set forth the argument in his own brief.
[28] "(d) In the ex parte proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer which will enable the tribunal to make an informed decision, whether or not the facts are adverse."
[29] See State v. Delvalle, No. P1-02-0211C, available at
2003 R.I. Super LEXIS 212 (R.I.Super. 2003) (Rhode Island Superior Court reaching the same conclusion when considering the impact of a grand juror request for exculpatory evidence.).
[30] The Defendant adopted all arguments that the Derderian Defendants made in connection with the alleged prosecutor misconduct. However, this Court did not address the Derderians' argument regarding the "foam newscast," as the Defendant neither stated, nor does the Court consider this argument to be at all relevant to the Defendant's motion.