GEORGE ST. GERMAIN *et al. vs.* GEORGE LAPP.

JULY 9, 1946.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

CONDON, J.   This is a bill in equity for the cancellation of a chattel mortgage, a realty mortgage and two promissory notes.  The bill is predicated on the ground that a loan of money for which these mortgages and notes were given is void for usury under general laws 1938, chapter 485, §2. After a hearing on bill, answer and proof in the superior

court, a decree granting the relief prayed for was entered, but on the conditions that complainants pay respondent the balance of the principal of the loan with legal interest and that they pay $203.86 which the trial justice found was equitably due the respondent as the result of the complainants' use of his money in discharging a prior loan from another creditor at a discount amounting to such sum.

From that decree respondent appealed on the grounds that the loan was governed by the law of Massachusetts under which it was not usurious, and that, if it was held that the law of Rhode Island governed, the new loan was nevertheless not usurious even under that law. Complainants also appealed from the decree on the ground that the conditions attached thereto were contrary to the principle and policy of our statute against usury.

Respondent's first ground of appeal is virtually that the loan was a Massachusetts contract or that, from the nature of the contract and the surrounding circumstances, it should be presumed that it was the intention of the parties to the contract that it should be governed by the law of that state. The facts and circumstances are briefly these: Complainants are husband and wife and reside in North Attleboro, Massachusetts, on a farm which they own and operate. Respondent is a resident of Pawtucket, Rhode Island, and has desk room in the office of the M. J. Gallagher Agency in that city. He is, however, not an employee of that agency but conducts a business on his own account in that office. Through the president of the agency with whom complainants were acquainted, they having bought their farm through his office, they solicited the respondent for a loan in order to pay off a chattel mortgage held by the Equitable Credit Corporation of Albany, New York.

On August 31, 1944, in Pawtucket, after some preliminary negotiations which took place in that city, the respondent loaned the complainants a sum sufficient to discharge that mortgage. In consideration for such loan the complainants executed and delivered on that day in the office of the M. J.

Gallagher Agency, their promissory note for $6500 payable in ninety days. They also executed and delivered to him a second note for $3000 payable in ninety days. The first note was secured by a chattel mortgage of the livestock and equipment on their farm and the second note by a mortgage of the farm.

No money was actually received by the complainants in return for those securities but respondent made the following payments on their behalf. To the Equitable Credit Corporation he paid for the discharge of its chattel mortgage $5863.50. The amount due thereon was $6067.36 but the mortgagee had agreed the day before with complainants' counsel to waive the sum of $203.86 if payment was made on or before September 1, 1944. To complainants' counsel he paid $36.50 which was accepted by the attorney as a payment by complainants for services rendered to them by him in the negotiations preliminary to and in the closing of the loan transaction. Respondent also gave complainants his receipt for $100 which he credited to them as a payment on their chattel mortgage note to him. These payments totaled $6000 which was the amount that complainants' counsel had informed respondent the complainants would need to discharge the prior chattel mortgage to the Equitable Credit Corporation. The chattel mortgage note to the respondent was drawn in the amount of $6500 because it had been agreed the day before at respondent's office in Pawtucket that he was to charge $500 in advance for the use of his money for ninety days. As to the note for $3000 and the real estate mortgage securing it, there was an agreement in writing that they were merely collateral security and were to be surrendered by the respondent upon receipt by him of $6500 in full payment of the chattel mortgage note.

On those facts we are of the opinion that the contract for this loan was clearly made in Rhode Island, was to be performed here and that it was governed by the law of Rhode Island. That the loan was made to persons domiciled in Massachusetts and was secured by a mortgage of chattels

and by another mortgage of land situated in that state are not controlling in the circumstances. On the contrary, the facts which really control the contract are these: The agreement to lend the money, the execution and delivery of the securities evidencing the loan, the actual passing of the consideration, and the making of the notes payable in Pawtucket, the domicile of the lender.

All of those acts took place in this state and they are indubitable proof that the contract between the parties was made and was to be performed in this state. In addition, all of the negotiations preliminary to the final closing of the transaction were conducted in Rhode Island. In such circumstances there is no room for arguing that the parties must have intended that the law of Massachusetts was to govern this contract. "If all of the important elements of a loan transaction have their situs in the same state such transaction is governed as regards the question of usury by the laws of that state. Hence, ordinarily, when the contract is made, the consideration is given, and payment is to be made all in the same state, or where the contract is made and is to be performed in the same state . . . the law of such state governs the contract on the question of usury." 66 C. J. 145, §9 c.

It is also well settled that in a transaction like the one before us, between parties similarly situated, usury inheres in the loan and not in the property mortgaged to secure its payment. Such a mortgage is no more than an incident to the principal transaction. "When a contract made and to be performed in one state is secured by a mortgage or other lien on land situated in another state, the question as to whether the interest provided for is usurious is generally held to be determined by the law of the former, on the ground that the mortgage is merely collateral to the principal obligation." 5 R. C. L. 982, §64. It is true that the courts of a few states have allowed the law of a third state, which is the *situs* of the security, to be applied but that is an exception to the general rule which rigidly confines the

parties to the law of the two places, that of the making and that of the performance of the contract. 2 Beale, Conflict of Laws, 1081. In the case at bar even the general rule would not help the respondent, since Rhode Island is both the place of the making and of the performance of the contract.

A case somewhat similar to the one at bar is *Whitman* v. *Conner,* 40 N. Y. Super. 339. In that case all the transactions concerning a loan took place in Rhode Island, including a mortgage of chattels situated in New York, and was to be fulfilled in Rhode Island. The court applied the well-recognized principle that a contract which is valid or invalid, as the case may be, where it is made and to be performed is valid or invalid everywhere. And it rejected the contention that the law of New York should govern because it was the *situs* of the chattels and held that the loan was governed by the law of Rhode Island.

Respondent, however, contends that a contrary rule is applied in case of usury where by so doing the validity of the loan can be preserved and cites in support of such contention, 6 Williston on Contracts 5097, 5098 n. 11. The cases cited by the author to support the text are clearly exceptions to the general rule. Whatever their merit may be in solving a problem where the contract was made in one state and was to be performed in another, we are not disposed to follow them in the case at bar, where the place of contracting and the place of performance are both in this state. The authorities support the view that where a note is made and payable in the same state in violation of its usury laws no circumstance is sufficient to take the note beyond the purview of those laws. 5 R. C. L. 981, §61. We are clearly of the opinion, therefore, that the validity of the loan in the instant case must be tested by the law of this state.

That law provides that, with certain exceptions, a loan of money where interest is charged directly or indirectly in excess of 30% shall be usurious and void. G. L. 1938, chap.

485, §§2 and 3. The respondent does not come within any of the exceptions. By §4 of the same chapter the borrower is authorized to bring an action of the case against the lender to recover any payments either of principal or interest which he, the borrower, may have paid. Prior to the enactment of this statute in its original form as it appears in P. L. 1909, chap. 434, any rate of interest was lawful in this state if agreed to between the parties to a contract. *Draper* v. *Horton*, 22 R. I. 592.

That statute changed the policy of the state from one of "free trade in money" to one of restrictive regulation of money lending accompanied by severe penalties for violation of the statute. Moreover, the legislature made the new policy one of positive benefit to the borrower by enabling him to recover any principal or interest which he may have paid to the lender on the invalid loan. By this provision it is clear beyond doubt that the legislative intent was to strip the violator not only of any increment accruing from the loan but also of the entire principal of the loan itself. In other words, the statute withdraws from the lender the privilege of collecting and retaining any interest as a result of his relations with the borrower, and it deprives him of his own money as well.

However, respondent seeks to avoid the application of the statute to the instant transaction by contending that it was not a loan. He claims that it was a business transaction, special in its nature, whereby he purchased for the benefit of the complainants an extension of time within which they would be able to readjust their obligation under their loan from the Equitable Credit Corporation. That contention is quite without merit. We think that the transaction is manifestly a loan of money for ninety days at a charge of $500 payable in advance. Such a charge on a loan of $5900, which was the amount actually received by complainants, is well over the rate of 30% per annum prescribed in the statute and is, therefore, usurious.

There is still another contention upon which respondent

relies to escape the doom of the statute. He argues that when this transaction is examined in its entirety and the actual monetary benefit which the complainants received is determined, it will appear that the $500 is at the rate of about 20% per annum. He arrives at that conclusion somewhat in this manner. Complainants, he contends, received not only $5900, which was used to discharge the Equitable Credit Corporation's chattel mortgage and to pay in part complainants' counsel for services rendered to them, but they also received, by virtue of the use of his money, an immediate cash saving of $203.86 on their obligation to the Equitable Credit Corporation. Respondent, therefore, claims that that sum should be deducted from the $500, making the net charge for the money loaned only $296.14 or at the rate of about 20% on $5900. That method of computation is ingenious but hardly convincing. Moreover, respondent is not entitled to claim any benefit as a result of the complainants receiving such discount through their attorney. Its proper effect was to reduce the amount of money which complainants needed to discharge the prior chattel mortgage, and not to reduce the respondent's charge for such money.

Respondent contends further that, "A bonus, admittedly usurious, paid for the extension of a prior valid existing loan, does not invalidate the loan, but will be applied in reduction of the loan." In support of that contention he cites *Lillig* v. *McGarrity*, 107 N. J. Eq. 147. The facts of that case were wholly different from the facts in the case at bar. There the bonus was charged by the original lender for the extension of the existing loan. Here the existing loan of the original lender was paid, its chattel mortgage securing it discharged, a wholly new loan was obtained from a new lender, and a new note and mortgage containing different terms were executed and delivered to take the place of the original note and mortgage. The case cited is, therefore, not in point and the principle contended for is not applicable.

Finally, respondent contends that "Where property of one person is used in discharging an obligation owed by another or a lien upon the property of another, under such circumstances that the other would be unjustly enriched by the retention of the benefit thus conferred, the former is entitled to be subrogated to the position of the obligee or lienholder." Restat. of Restitution 653, §162. In his brief respondent states that his contention is a verbatim quotation from the Restatement and he cites the following cases in its support: *National Shawmut Bank* v. *Fidelity Mutual Life Ins. Co.*, 61 N. E. 2d (Mass.) 18, 159 A. L. R. 478; *Rossiter* v. *Sanaghiaro*, 78 N. H. 484. We are not, however, concerned here with the soundness of those cases or the principle of law which, respondent claims, they support. Here we are not confronted with any question of priority of liens or subrogation, as in the cases cited, but with a single clear-cut issue of a simple loan of money. That the loan was used to discharge a prior valid lien does not inure to the benefit of the respondent nor can he successfully claim that the discharge should be treated as an assignment in order to save him from the consequences of the usury which otherwise inheres in the loan. Obviously the situation here does not call for the application of the equitable principle contended for by the respondent.

All of respondent's contentions in support of his appeal having been found to be without merit, there remains to be considered only the complainants' appeal. They contend, in support of their appeal, that the trial justice erred in requiring them to pay the balance of the note with legal interest at 6%, because a court of equity has no power to substitute another contract for legal interest in the place of a usurious contract made void by the statute, and impose it upon the borrower. This is not a new question in this state. In *Moncrief* v. *Palmer*, 44 R. I. 37, this court expressly held that a borrower who sought relief in equity on the ground of usury was required to do equity by first paying the lender

the principal of the loan with legal interest, as a condition precedent to obtaining relief.

Complainants concede that that case stands in their way and defeats their claim if this court is now going to apply with strict rigor the doctrine of *stare decisis*. But they argue that that doctrine is not necessarily applicable in the premises, as the *Moncrief* case is but a single case and has not been cited by this court since it was handed down twenty-five years ago. It is true that under the doctrine of *stare decisis* courts are generally more constrained to follow a rule of law which has been declared by a series of decisions rather than by one standing alone. 21 C. J. S. 297, §186. But a single decision may also be of compelling force, especially where it is supported by several like cases in other jurisdictions and represents the weight of authority. The *Moncrief* case is in that category, *Yonack* v. *Emery* (Tex.), 70 A. L. R. 684, 693 n. Hence it is entitled to much greater consideration as a precedent binding upon us than it would be if it were the sole case of its kind anywhere.

And there is yet another reason why we should accord it more respect than complainants would allow. In a sense the rule laid down in that case may be looked upon as a judicial determination of the scope of our usury statute. As such it has stood for twenty-five years and during that long period the legislature has been content to let it stand as the law when, if it deemed it contrary to the policy of the statute, it could have very easily abrogated or modified it by legislation. That it has not done so should be persuasive with us although not necessarily controlling. We are therefore of the opinion that we should not, at this time, re-examine the grounds of the opinion in that case except in one particular, namely, that of allowing the lender to enjoy the receipt of legal interest on his loan.

Our usury statute deprives a lender who violates it of two things, first, the right to collect and retain the stipulated interest, and, second, the right to the principal of the loan, even to the extent of authorizing the borrower to re-

cover in an action at law any payment of it which he had made to the lender. A court of equity, however, ought to differentiate between those two deprivations. Our court did not do so in the *Moncrief* case. In common with a majority of American courts it seems to have predicated its action on the ground that there is a moral or equitable obligation to pay interest for a loan of money and, therefore, that there was as much reason for requiring the borrower seeking relief in equity to pay at least legal interest as for requiring him to pay the principal of the loan. We do not think so. To require the borrower to return the amount of the money loaned is unquestionably equitable and is not without a moral base. Such a rule is consistent with equity's aversion to penalties and especially its tendency to look with stern disfavor upon forfeitures and to relieve against them. But when we come to the exaction of interest for the use of money, we are in an entirely different field.

Interest is purely a creature of statute. For over fifteen hundred years throughout Christendom it was positively immoral. 39 Cyc. 890. The church held it to be against the laws of God and morality. 30 Am. Jur. 7, §3. And in England down to the reign of Henry VIII it was a crime as well. "By the common law, interest could in no case be recovered. As early as the reign of King Alfred, in the ninth century, it was held in detestation. Churchmen and laymen alike denounced it. Glanville, Fleta, and Bracton all speak of it in terms of abhorrence." *National Bank of the Commonwealth* v. *Mechanics' National Bank,* 94 U. S. 437.

Whether or not that view of interest was morally correct is not now of any concern of the law. As the United States supreme court has said, although interest was once held in abhorrence it has now come "to be recognized that its payment was, as a general principle, but the compensation due for the use of money . . . ." *Billings* v. *United States,* 232 U. S. 261, 285. But the important thing for us to remember in connection with the right solution of the problem in the case at bar is that that general principle had no life

in it to overcome the older theory until the legislature gave it form and substance by statute. Such statute at first merely tolerated interest in a certain few transactions. 30 Am. Jur. 7, §3. Later the field was broadened and finally in England in 1854 all restrictions on the right to exact interest and the rate to be charged therefor were abolished. There followed a period that has been called the period of "free trade in money".

In this state we seem to have shared that philosophy, as, down to the original enactment in 1909 of the statute we are now considering, full freedom of contract in this matter was allowed. However, in that year the pendulum swung back again, although not entirely, in the opposite direction and restrictions on the right to charge interest were imposed with penalties, civil as well as criminal, for their violation. The civil penalty is severe and plainly indicates that it is the policy of the law in this state to deprive a usurer of all right to interest or principal involved in the usurious loan.

The respondent here contends that he should be awarded such interest as is allowed by law for the use of his money, notwithstanding that he stands before the court as a usurer whose contract with the borrower is absolutely void by force of the very statute regulating the payment of interest for the use of money. That statute is a permissive statute which practically says to the lender that he may have interest for the use of his money provided he does not charge it at a greater rate than is prescribed by the statute, but if he does charge a greater rate he loses his right to any interest whatever. And as a respondent in a court of equity he cannot be heard asserting a right to *legal* interest because, as a usurer, he has no such *legal* right. We are, therefore, of the opinion that *Moncrief* v. *Palmer, supra,* should be modified so that in a case of this kind the borrower should be required, as a condition precedent to obtaining relief in a court of equity, to pay simply the principal of the loan. On that view the superior court erred in requiring these complainants to pay interest at the legal rate.

We are also of the opinion that the court erred in allowing the respondent credit for the discount of $203.86 which was obtained upon discharging the prior obligation to the Equitable Credit Corporation. As was observed above, the evidence does not show that the respondent had anything to do with obtaining such discount. That his money was used to pay the prior loan is not a valid reason for holding that the saving of $203.86 by the complainants must be credited to him. How much of respondent's money complainants needed to pay the prior loan was no concern of the respondent. He was charging $500 for the use of that money, and his only concern with the prior existing loan was to see that it was discharged. It is clear that the respondent cannot claim the benefit of the Equitable Credit Corporation's discount as a cash advancement from him to the complainants. Such a claim is simply without a sound basis in law or logic.

The respondent's appeal is denied, the complainants' appeal is sustained, and the decree appealed from is reversed in part and affirmed in part. The parties may present to this court a form of decree, in accordance with this opinion, to be entered in the superior court.

*Peter W. McKiernan, Albert Lanthier*, for complainants.

*Clarence N. Woolley, Wm. R. Goldberg*, for respondent.