Issued June 30, 2021

Corrected July 1, 2021

**Supreme Court**

No. 2019-468-Appeal.
(PB 11-1922)

Commerce Park Realty, LLC, et al.     :

v.     :

HR2-A Corp. as General Partner     :
of HR2-A Limited Partnership et al.

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

**Supreme Court**

No. 2019-468-Appeal.
(PB 11-1922)
(Concurrence and Dissent
begins on page 30)

Commerce Park Realty, LLC, et al.    :

              v.                :

 HR2-A Corp. as General Partner    :
of HR2-A Limited Partnership et al.

Present:  Suttell, C.J., Goldberg, Robinson, and Long, JJ.

## C O R R E C T E D   O P I N I O N

**Justice Long, for the Court.**  The case before us involves complex and protracted litigation regarding multiple high-interest loans between commercial borrowers and lenders.  The loans were for the development of the so-called "Centre of New England" project, which comprises retail, restaurant, hotel, multifamily residential, light industrial, and mixed-use developments in Rhode Island (the Centre of New England project).  The defendants, HR2-A Corp. as General Partner for HR2-A Limited Partnership (HR2-A); HR4-A Corp. as General Partner of HR4-A Limited Partnership (HR4-A); MR4A-JV Corp. as General Partner of MR4A-JV Limited Partnership; and Realty Financial Partners (collectively the RFP defendants), appeal from the grant of partial summary judgment in favor of the

plaintiffs, Commerce Park Realty, LLC; Commerce Park Properties, LLC (CPP); Commerce Park Commons, LLC; Commerce Park Associates 4, LLC; and the permanent receiver appointed for the four just-referenced limited liability companies (collectively the receivership plaintiffs); as well as Commerce Park Associates 11, LLC; Dartmouth Commons, LLC (Dartmouth); Warwick Village, LLC; Universal Properties Group, Inc.; Nicholas E. Cambio individually (N. Cambio) and as Trustee of the Nicholas E. Cambio, Roney A. Malafronte, and Vincent A. Cambio Trust; and Vincent A. Cambio (V. Cambio) (collectively the Cambio plaintiffs). That grant of partial summary judgment primarily determined that a series of loans made by the RFP defendants was usurious and null and void.[1] For the reasons set forth herein, we affirm the judgment of the Superior Court.

## Facts and Procedural History

This case emanates from a series of commercial loans issued by HR2-A and HR4-A, Massachusetts corporations with principal places of business located in Massachusetts, to the receivership plaintiffs and the Cambio plaintiffs beginning in 1997.[2] As security for the loans, the borrowers mortgaged hundreds of acres of

---

[1] Decided of even date is our opinion in *Commerce Park Realty, LLC v. HR2-A Corp.*, No. 2020-33-A., 2021 WL ___, __ A.3d __ (R.I., June 30, 2021), a cross-appeal filed by the Cambio plaintiffs which sought review of secondary determinations made by the Superior Court at the same time that the court declared the loans usurious.

[2] The borrowers in this case entered into receivership after the execution of the loans giving rise to this appeal; a permanent receiver was appointed in 2013. We

property located in West Greenwich, East Greenwich, and Coventry, Rhode Island, and owned by the receivership plaintiffs. The debt that the receivership plaintiffs and the Cambio plaintiffs owed to HR2-A pursuant to the promissory notes exceeded $14 million, and the debt that receivership plaintiffs owed to HR4-A exceeded $7 million (the pre-2000 loans or pre-2000 debt). By July 2000, the receivership plaintiffs and the Cambio plaintiffs owed HR2-A and HR4-A over $21 million on the loans.

In July 2000, the General Assembly amended the Rhode Island usury statute, thereby creating an exception to the maximum allowable interest rate for commercial entities.[3] *See* P.L. 2000, ch. 211, § 1 (effective July 13, 2000). Notwithstanding G.L. 1956 § 6-26-2(a), which dictates that no interest rate on a loan shall exceed the greater of 21 percent per annum, the resulting § 6-26-2(e) provides that

> "there is no limitation on the rate of interest that may be legally charged for the loan to, or use of money by, a commercial entity, where the amount of money loaned exceeds the sum of one million dollars ($1,000,000) and where repayment of the loan is not secured by a mortgage against the principal residence of any borrower; provided, that the commercial entity has first obtained a pro forma methods analysis performed by a certified public accountant licensed in the state of Rhode Island indicating that the loan is capable of being repaid."

nonetheless refer to them as "receivership plaintiffs" throughout the opinion for ease of reference.

[3] The RFP defendants lobbied the General Assembly to enact this exception to the law against usury for commercial entities.

After this legislation was enacted, HR2-A and HR4-A demanded payment on the then-matured pre-2000 debt.

The receivership plaintiffs and the Cambio plaintiffs were unable to make payment. Consequently, HR2-A and HR4-A agreed to refinance the pre-2000 loans at interest rates that exceeded the previously charged rates. Interest began to accrue at these new interest rates on August 1, 2000, prior to the execution of the loan refinancing documents. With respect to the loan that exceeded $14 million (the $14 million loan), HR2-A charged a compounded monthly interest rate of 2.67 percent, resulting in an effective annual interest rate of 34 percent. With respect to the loan that exceeded $7 million (the $7 million loan), HR4-A charged a compounded monthly rate of 2 percent, resulting in an effective annual interest rate of 26 percent.

In September 2000, prior to closing on the refinanced loans, HR2-A and HR4-A required the receivership plaintiffs and the Cambio plaintiffs to obtain pro forma methods analyses in accordance with § 6-26-2(e). A month later, after the receivership plaintiffs and the Cambio plaintiffs were either unwilling or unable to produce the pro forma analyses, and after charging interest rates on the loans in excess of 21 percent since August 1, 2000, HR2-A and HR4-A subsequently modified their demand to instead permit the receivership plaintiffs and the Cambio plaintiffs to certify in writing that they had obtained the pro forma methods analyses in accordance with § 6-26-2(e).

The closing took place on December 11, 2000, at which time the parties[4] executed the refinancing documents related to the $14 million loan and the $7 million loan.[5] The receivership plaintiffs and the Cambio plaintiffs executed the documents before a notary public in West Warwick, Rhode Island and the loan documents were backdated to August 1, 2000.[6] The receivership plaintiffs and the Cambio plaintiffs also executed written certifications for each loan at the closing. Those "borrower certifications," which were drafted by the RFP defendants and were not notarized, contained the following relevant language:

> "(2) The undersigned have obtained a pro forma methods analysis from a certified public accountant for each of the Borrowers as required by R.I. Gen. Laws § 6-26-2.
>
> "(3) The aforesaid pro forma methods analyses indicate that the Borrowers are capable of repaying the Loan.
>
> "(4) For the purposes of this certification, the Borrowers represent that the term 'pro forma methods analysis' means an analysis of historical sales data, lease valuations based on existing leases and a review of appraisals of existing leases performed for other financial institutions, which analysis indicates that the value to loan ratio

---

[4] The Cambio plaintiffs were coborrowers with the receivership plaintiffs on only the $14 million loan. The Cambio plaintiffs were guarantors of the $7 million loan.

[5] The $14 million loan was secured by property in East Greenwich, West Greenwich, and Coventry, Rhode Island, as well as in Dartmouth, Massachusetts. The $7 million loan was secured by property in East Greenwich, West Greenwich, and Coventry, Rhode Island. Both loans were executed in West Warwick and contained choice-of-law provisions designating Rhode Island as the source of applicable law.

[6] More than $2 million in interest had accrued on the loans between August 1 and December 10, 2000.

> expressed as a percentage exceeds one hundred percent (100%).
>
> "(5) The Lender and its counsel may rely on the foregoing representations of the undersigned."[7]

As with the $14 million and $7 million loans, the borrower certifications were backdated to August 1, 2000.[8]

On December 13, 2000, Dartmouth, N. Cambio, V. Cambio, and Roney A. Malafronte (Malafronte) granted a promissory note in the amount of $4.3 million to HR4-A (the $4 million loan or the $4 million note). Dartmouth is a Rhode Island limited liability company, and N. Cambio, V. Cambio, and Malafronte are individuals domiciled in Rhode Island. The note was secured by the partially constructed Centre of New England project, as well as property located in Massachusetts. The compounded monthly interest rate for the loan was 1.75 percent, which resulted in an effective annual interest rate greater than 23 percent. Notably, the $4 million note contained a choice-of-law provision that stated, "This note for all purposes shall be enforced and construed in accordance with the substantive law

---

[7] It is notable that the maturity date for the $14 million loan and the $7 million loan was set for the month following the execution of the loans, on January 31, 2001.

[8] The borrower certification for the $14 million loan was executed by and between HR2-A and the receivership plaintiffs. The borrower certification for the $7 million loan was executed by and between HR4-A and the receivership plaintiffs.

of the Commonwealth of Massachusetts, without resort to the state's conflict of laws rules." Each borrower signed the note in West Warwick, Rhode Island.[9]

Both the $14 million loan and the $7 million loan matured on January 31, 2001. The receivership plaintiffs and the Cambio plaintiffs were unable to satisfy their obligations under the two loans by that date, and the parties subsequently amended and restated the promissory notes for both loans on September 20, 2001 (the restated loans).[10] The terms of the loans changed such that payment pursuant to the restated loans became due on demand by HR2-A and HR4-A. The annual interest rate on the restated loans exceeded 23 percent and the notes contained the following language:

> "NOTWITHSTANDING THE INCLUSION IN THIS NOTE OF THE ABOVE EVENTS OF DEFAULT, THIS NOTE IS AND SHALL REMAIN FOR ALL PURPOSES A DEMAND NOTE AND AT ALL TIMES IS PAYABLE ON DEMAND OF HOLDER IRRESPECTIVE OF WHETHER ANY EVENT OF DEFAULT EXISTS."

Notably, no pro forma method analyses were conducted in connection with the restated loans, nor did the receivership plaintiffs or the Cambio plaintiffs execute

---

[9] The $4 million loan matured on December 13, 2002.

[10] Interest accrued on the $14 million loan and the $7 million loan during the several months between their maturity and the execution of the restated loans at rates in excess of 21 percent per annum.

As with the $14 million loan and the $7 million loan, the effective date of the restated loans was backdated to August 1, 2000.

any borrower certifications. The restated loans were signed by the receivership plaintiffs and the Cambio plaintiffs before a notary public in West Warwick, Rhode Island.

On March 28, 2003, CPP, a Rhode Island limited liability company, granted a demand promissory note to HR4-A in the principal amount of $350,000, secured by property located in Coventry (the $350,000 loan). The compounded monthly interest rate for the $350,000 loan was 1.75 percent, which resulted in an effective annual interest rate of over 23 percent. The note for the $350,000 loan contained a choice-of-law provision that stated, "This Note shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts." Further, the top corner of the note bears the notation "Boston, Massachusetts."[11]

Thereafter, in April 2003, HR2-A and HR4-A demanded payment in full on the restated loans; however, the receivership plaintiffs and the Cambio plaintiffs were unable to make payment. On April 24, 2003, HR2-A, HR4-A, the receivership plaintiffs, and the Cambio plaintiffs then executed a "forbearance and conveyance agreement" (the forbearance agreement). The forbearance agreement, which was executed so that the receivership plaintiffs could avoid foreclosure, provided that

---

[11] The note also provides that CPP "solicited the loan subject to this Note from the Lender in the Commonwealth of Massachusetts, all Related Documents were executed in the Commonwealth of Massachusetts, and any and all payments under the Note shall be made to Lender only at the Massachusetts address set forth herein."

HR2-A and HR4-A would forgo collecting on the restated loans and the $350,000 loan, provided that "[t]o the extent any such defenses, setoffs, counterclaims ever existed, they are hereby waived and the Lenders are released, remised and forever discharged from any and all claims * * * in consideration for the Lenders' agreements contained" in the forbearance agreement.[12] The forbearance agreement also contained a governing law provision that designated Rhode Island as the chosen forum relating to that agreement, stating that the agreement had been negotiated, accepted, and made in Rhode Island.

In 2005, the $4 million note was amended and restated and secured by property located in East Greenwich, West Greenwich, and Coventry, Rhode Island. Like the original $4 million note, each borrower executed the amended and restated note in West Warwick, Rhode Island.

Six years later, on April 11, 2011, HR2-A and HR4-A dispatched demand letters to the receivership plaintiffs and the Cambio plaintiffs exercising their right to demand payment-in-full on all of the outstanding loans. The payoff amount, including accrued interest, totaled over $143 million. Three days prior to the demand, however, the receivership plaintiffs and the Cambio plaintiffs commenced the present civil action by filing a verified complaint against the RFP defendants in

_____

[12] The forbearance agreement also required the receivership plaintiffs and the Cambio plaintiffs to convey approximately 187 acres of real property to HR2-A and HR4-A's designee within three business days' notice.

- 9 -

the Superior Court.[13] The receivership plaintiffs and the Cambio plaintiffs filed a motion for leave to file an amended complaint on February 10, 2014, and the trial justice granted the motion in part on September 8, 2014.[14] The complaint sought, among other things, judgment against the RFP defendants for violation of the usury law, § 6-26-2.[15]

In October 2014, the receivership plaintiffs moved for partial summary judgment on Counts I and IV of their amended complaint, which alleged that the $14 million loan and the $7 million loan were usurious. In the months that followed, the

---

[13] On April 20, 2011, this case was removed to the United States District Court for the District of Rhode Island. On September 18, 2013, the case was remanded to the Superior Court.

[14] This constituted the fifth amended complaint.

[15] The amended complaint alleged fifty-three counts. Specifically, the receivership plaintiffs' claims included usury (Counts I and IV); civil liability pursuant to G.L. 1956 § 9-1-2 and G.L. 1956 § 6-26-2 (Counts II and V); violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), chapter 15 of title 7 of the general laws (Counts III, VI, XXIV, and VIII); equitable subordination (Count X); and breach of the implied covenant of good faith and fair dealing (Count XII). The crux of the Cambio plaintiffs' claims included declaratory judgment that the loans in question were usurious (Counts XIII, XIX, and XXV); reimbursement of payment damages and punitive damages (Counts XIV, XV, XX, XXI, XXX, and XXXI); and violations of RICO (Counts XVI, XVII, XIII, XXII, XXIII, XXIV, XXVI, XXVII, XXVIII, XXXII, XXXIII, and XXXIV). They also sought a declaratory judgment that releases and waivers executed by the borrowers and guarantors were invalid (Count XXXVI); damages pursuant to § 9-1-2 (Counts XXXVII, XXXVIII, XXXIX, and XL); and injunctive relief (Counts XLVI, XLVII, and XLVIII).

Cambio plaintiffs and the RFP defendants also moved for summary judgment on a number of issues.[16]

In their motion for partial summary judgment, the receivership plaintiffs alleged two usury violations in relation to the $14 million loan and the $7 million loan. The Cambio plaintiffs contended in their motion for summary judgment that the waiver of claims against the RFP defendants that was included in the forbearance agreement was against public policy and was, therefore, ineffective. They also asserted that the $4 million loan and the $350,000 loan were governed by Rhode Island law, notwithstanding the choice-of-law provisions that contained language to the contrary.

The RFP defendants argued in their motion for summary judgment that the $14 million loan and the $7 million loan, along with the restated loans, were not usurious; that any claim of usury related to those loans was waived pursuant to the forbearance agreement; and that the $4 million loan and the $350,000 loan were governed by Massachusetts law.

---

[16] In conjunction with these motions, the RFP defendants filed a motion for a ruling on the usury claim entitlement issue, seeking a declaration that if certain loans were deemed usurious, the Cambio plaintiffs were not entitled to disgorgement payments under § 6-26-4(c)—the section of the usury statute penalizing usurious contracts. The trial justice granted this motion in part. The Cambio plaintiffs filed a notice of appeal, and this Court's opinion in that companion case has been issued on even date. *See supra* footnote 1.

Following lengthy motion practice, the trial justice considered and ruled upon the motions for summary judgment in a forty-one-page written decision in June 2019 that granted the receivership plaintiffs' motion for partial summary judgment with respect to Counts I and IV of their amended complaint, and denied the RFP defendants' motion for summary judgment regarding the same.[17]

On July 3, 2019, the receivership plaintiffs filed a motion for summary judgment on Count VII of the amended complaint, which alleged that the $350,000 loan was usurious, and Count IX of the amended complaint, which sought a declaratory judgment that the $14 million loan, the $7 million loan, the $4 million loan, and the $350,000 loan were usurious and void, and that the release and waiver provision contained within the forbearance agreement was null and void. On September 19, 2019, the trial justice issued a ruling from the bench in which she granted summary judgment for the receivership plaintiffs on Counts VII and IX; an

---

[17] In that decision the trial justice (1) granted the receivership plaintiffs' motion for partial summary judgment on Counts I and Count IV; (2) denied RFP defendants' motion for summary judgment on Counts I and IV; (3) granted the Cambio plaintiffs' motion for summary judgment on counts XIII, XIX, XXXV, XXXVI and denied the motion on counts XV and XX; and (4) granted RFP defendants' entitlement motion for summary judgment on counts XIV, XV, XX, XXI, XXXVII, XXXVIII, XXXIX, XL, and LIII, and denied their motion on counts XVI, XVII, XXII, XXIII, XXIV, XXVI, XXVII, XXVIII, XXX, XXXI, XXXII, XXXIII, XXXIV, XLIII, XLIV, and XLV.

The decision was amended by order of the court, filed on August 22, 2019, to correct errors contained within the decision that was rendered in June 2019.

- 12 -

order entered that day reflecting her ruling, from which the RFP defendants have appealed.

On appeal, the RFP defendants specify five claims of error. They assert that the trial justice erred (1) in finding that the $14 million loan and the $7 million loan were usurious; (2) in finding that the RFP defendants charged usurious interest rates on the $14 million loan and the $7 million loan prior to the execution of those loans, between August 1, 2000, and December 11, 2000; (3) in finding that the waiver of usury claims brought by the receivership plaintiffs and the Cambio plaintiffs was ineffective; (4) in finding that the $4 million loan and the $350,000 loan were governed by Rhode Island law; and (5) by failing to rule that the $14 million loan and the $7 million loan remained due and payable to the RFP defendants because they were originally made prior to the accrual of any usurious interest rates. We shall address these issues in turn.[18]

**Standard of Review**

"It is well established that this Court reviews a grant of summary judgment *de novo*." *Moore v. Rhode Island Board of Governors for Higher Education*, 18 A.3d 541, 544 (R.I. 2011). "We view the evidence in the light most favorable to the nonmoving party, and 'if we conclude that there are no genuine issues of material

---

[18] Because the first two issues raised by the RFP defendants are closely related, we address them together in our analysis.

- 13 -

fact and that the moving party is entitled to judgment as a matter of law,' we will affirm the judgment." *Id.* (brackets omitted) (quoting *Berman v. Sitrin*, 991 A.2d 1038, 1043 (R.I. 2010)). Further, a party opposing a motion for summary judgment has "an affirmative duty to set forth specific facts showing that there is a genuine issue of material fact." *Sauro v. Lombardi*, 178 A.3d 297, 303 (R.I. 2018) (quoting *The Providence Journal Co. v. Convention Center Authority*, 774 A.2d 40, 46 (R.I. 2001)).

**Discussion**

**Usury**

In their motion for partial summary judgment, the receivership plaintiffs asserted that HR2-A and HR4-A committed usury because (1) they failed to obtain the required pro forma methods analyses and (2) regardless of the validity of the borrower certifications that were executed on December 11, 2000, HR2-A and HR4-A charged usurious interest rates from August 1 through December 10, 2000. The trial justice agreed with the receivership plaintiffs, determining that HR2-A and HR4-A had charged the receivership plaintiffs and the Cambio plaintiffs usurious interest rates prior to the execution of the borrower certifications and that the

borrower certifications did not entitle HR2-A and HR4-A to charge interest rates in excess of 21 percent.[19]

On appeal, the RFP defendants contend that the trial justice's findings were in error because the exemption established in § 6-26-2(e) permitted HR2-A and HR4-A to charge interest rates in excess of 21 percent; they further argue that the interest rates established prior to the execution of the borrower certifications were not usurious because, despite the fact that the rates were "made" effective August 1, 2000, the rates were not "charged" until December 11, 2000.

The principal issue presented is whether a lender may be free of the maximum interest provision of § 6-26-2 if a borrower certifies in writing that the usury exception articulated in § 6-26-2(e) has been met, but where no other evidence demonstrates that the borrower obtained a pro forma methods analysis performed by a certified public accountant who is licensed to do business in Rhode Island.

Rhode Island usury law, found at chapter 26 of title 6 of the general laws, dictates the maximum allowable interest rate that lenders are permitted to charge:

> "Subject to the provisions of title 19, no person, partnership, association, or corporation loaning money to or negotiating the loan of money for another, except duly licensed pawnbrokers, shall, directly or indirectly, reserve,

---

[19] The receivership plaintiffs also contended before the Superior Court that HR2-A and HR4-A charged usurious interest rates with respect to the restated loans. Having found that the original $14 million loan and the $7 million loan were usurious, however, the trial justice did not address the receivership plaintiffs' argument in this respect.

charge, or take interest on a loan, whether before or after maturity, at a rate that shall exceed the greater of twenty-one percent (21%) per annum or the alternate rate specified in subsection (b) of this section of the unpaid principal balance of the net proceeds of the loan not compounded, nor taken in advance, nor added on to the amount of the loan." Section 6-26-2(a).

Accordingly, we have recognized that "interest rates in excess of 21 percent per annum are deemed usurious." *NV One, LLC v. Potomac Realty Capital, LLC*, 84 A.3d 800, 805 (R.I. 2014) (citing § 6-26-2(a)). Contracts that violate § 6-26-2(a) "are usurious and void, and the borrower is entitled to recover any amount paid on the loan." *Id.* (citing § 6-26-4). "The lender's subjective intent to comply with the usury laws is immaterial." *Id.*

In *NV One, LLC*, this Court determined that a borrower cannot contract with a lender to pay an interest rate in excess of the maximum rate established by § 6-26-2. *NV One, LLC*, 84 A.3d at 801. In so doing, we examined the policy supporting § 6-26-2. *Id.* at 807-10. In holding that "lack of intent 'is no excuse for violation of the statute[,]'" *id.* at 808 (quoting *Burdon v. Unrath*, 47 R.I. 227, 231, 132 A. 728, 730 (1926)), we opined that "[i]t is clear that the Legislature intended an inflexible, hardline approach to usury that is tantamount to strict liability." *Id.* at 807. This is so because "there is a strong public policy against usurious transactions, with lenders—typically in a better position to understand the terms of the loan—

- 16 -

bearing the burden of compliance." *Id.* at 810. Thus, the onus is on lenders to ensure compliance with usury law.[20] *See id.*

In the present case, it is undisputed that the RFP defendants charged interest rates in excess of 21 percent per annum upon the closing of the $14 million loan and the $7 million loan on December 11, 2000. As such, the analysis begins with determining whether the RFP defendants have met the usury exception enumerated in § 6-26-2(e). The answer to this question is determinative of whether, pursuant to the usury law, the RFP defendants are "either bound by the maximum interest provision and all its constituent penalties, or [are] completely free from them." *NV One, LLC*, 84 A.3d at 809. Because the money in this case (1) was loaned to commercial entities, (2) exceeded $1 million, and (3) was not secured against the principal residences of any of the borrowers, the remaining question is whether the borrower certifications satisfy the requirements of § 6-26-2(e).

Turning to § 6-26-2(e), it is clear that the RFP defendants could only permissibly charge interest rates in excess of 21 percent per annum if the receivership plaintiffs "ha[d] first obtained * * * pro forma methods analys[e]s performed by a certified public accountant licensed in the state of Rhode Island

---

[20] We emphasize that strict compliance with the usury law benefits both borrowers and lenders. Such compliance protects borrowers from entering into reckless financial agreements and protects lenders by ensuring, based on empirical evidence, that borrowers are able to pay high-interest loans.

indicating that the loan[s] [are] capable of being repaid." Section 6-26-2(e). The statute leaves little room for interpretation—unless the borrowers first obtain the required pro forma methods analyses, the exception is not applicable.

In this case, the borrower certifications indicate that the required pro forma methods analyses were performed, but the record is devoid of any competent evidence that the analyses were actually performed. The RFP defendants suggest that pro forma methods analyses *were* performed in accordance with the usury statute because of the borrowers' written certifications to that effect. However, the RFP defendants can point only to the unnotarized certifications. The RFP defendants are not only unable to produce the requisite analyses, but they are also unable to identify the certified public accountant licensed to do business in Rhode Island who allegedly performed those analyses. The RFP defendants have therefore failed to demonstrate that the required analyses were "obtained" by the borrowers, pursuant to the clear language of the statute.[21]

Although the receivership plaintiffs indicated in the borrower certifications that they had, in fact, obtained the required analyses, such statements by borrowers are insufficient to meet the terms of the unambiguous exception to the usury law

---

[21] Without any evidence that the analyses were actually performed and "obtained[,]" as required by § 6-26-2(e), it would have been unreasonable for the RFP defendants to believe that such large sums of money, loaned at high interest rates, could be repaid in such a short period of time.

- 18 -

contained in § 6-26-2(e). When faced with the "binary dynamic" between the usury law and the exception to the law contained in § 6-26-2(e), one party must bear the risk of noncompliance with the statute. *See NV One, LLC*, 84 A.3d at 809. Our caselaw places that burden on the lender.[22] *Id.* Accordingly, the exception contained in § 6-26-2(e) does not apply here because the RFP defendants have failed to show that the receivership plaintiffs first obtained the required pro forma methods analyses prior to charging interest rates in excess of 21 percent per annum.

The RFP defendants quote *Reichwein v. Kirshenbaum*, 98 R.I. 340, 201 A.2d 918 (1964), for the proposition that "a debtor by his voluntary act cannot render usurious that which but for such act would be free from usury." *Reichwein*, 98 R.I. at 343, 201 A.2d at 920. In that light, the RFP defendants assert that, pursuant to the Court's holding in *Reichwein*, the receivership plaintiffs have no viable usury claim because it was the receivership plaintiffs who certified, by way of the borrower certifications, that the exception articulated in § 6-26-2(e) was met. However, *Reichwein* is inapposite because in that case, unlike in the case at bar, the loans at issue were not facially usurious. *Id.* at 345, 201 A.2d at 921.

Similarly unavailing is the RFP defendants' argument that the established interest rates prior to the execution of the borrower certifications were not usurious

---

[22] The RFP defendants conceded during oral argument that it is the lender who bears the burden of ensuring compliance with the law against usury.

because, despite the fact that the rates were "made" effective August 1, 2000, the rates were not "charged" until December 11, 2000. The record reveals that interest at rates in excess of 21 percent per annum in fact accrued on the $14 million loan and the $7 million loan between August 1 and December 10, 2000, for which the receivership plaintiffs were responsible. It is our opinion that the accrual of interest at rates in excess of 21 percent per annum is deemed usurious under the usury law. *See* § 6-26-2(a) (stating in part that "no person * * * shall, directly *or indirectly*, reserve, charge, or take interest on a loan, whether before or after maturity, at a rate that shall exceed the greater of twenty-one percent (21%) per annum") (emphasis added).[23]

## The Release and Waiver Provision

The RFP defendants, relying on *DeFusco v. Giorgio*, 440 A.2d 727 (R.I. 1982), contend on appeal that the release and waiver provision in the forbearance agreement is valid because the forbearance agreement was executed, they assert, "freely and knowingly, after reasonable reflection, with the opportunity to obtain the assistance of legal counsel and for the purpose of avoiding litigation."

---

[23] We note that the fact that the $14 million loan and the $7 million loan were backdated to August 1, 2000, is fatal to the RFP defendants' assertion that the loans were not usurious, because the retroactive charges contravene the usury statute's requirement that the pro forma methods analyses must first have been obtained before the lenders would have been permitted to charge interest rates in excess of 21 percent per annum.

The RFP defendants ask this Court to decide whether a borrower of a mature, immediately payable loan with an interest rate exceeding 21 percent per annum may waive the right to bring a usury claim against the lender in consideration of the lender's agreement to forbear from collecting on the loans. Notwithstanding the Legislature's strong public policy against usurious loans, a debtor is not precluded from waiving the "defense of usury under all circumstances." *DeFusco*, 440 A.2d at 732. In *DeFusco*, the Court recognized that "waiver of a usury defense should be permitted when it is freely and knowingly made after reasoned reflection for the legitimate purpose of avoiding or settling litigation." *Id.* We will not recognize a waiver of usury, however, if the release is "merely a subterfuge to evade the usury statutes." *Id.* Because of the often coercive nature of such releases, the Court is particularly skeptical with regard to "a situation in which a borrower has executed a release of all claims or defenses of usury either contemporaneous with the signing of a promissory note or in exchange for additional advances of funds." *Id.*

The case at bar exemplifies the coercive nature of such waivers of usury claims. In April 2003 the RFP defendants gave the receivership plaintiffs the option either: (1) to pay off the restated loans, which were due on demand and had accrued substantial interest, or (2) to enter into a forbearance agreement. Unable to pay the restated loans on demand, and faced with this Hobson's choice, the receivership plaintiffs agreed to enter into the forbearance agreement in an effort to avoid the

penalty of foreclosure.[24] The record reveals that the nature of the execution of the forbearance agreement was highly coercive "in light of the pressing financial needs of the borrower[s]." *DeFusco*, 440 A.2d at 732.

Notably, there is no evidence that the receivership plaintiffs and the Cambio plaintiffs entered into the forbearance agreement for the "purpose of avoiding or settling litigation." *DeFusco*, 440 A.2d at 732. The facts of the instant case are also markedly distinguishable from those in *DeFusco*, where the defendants waived any claims that they had against the plaintiff, including usury claims, by entering into a consent judgment. *Id.* at 729. As the *DeFusco* Court explained, by entering into a consent judgment, the defendants there had, "in effect, already had their day in court to present these defenses[;] * * * they waived all defenses relating to the subject matter underlying the judgment." *Id.* The forbearance agreement in this case, however, was executed in 2003, several years before litigation commenced in 2011. This attenuation highlights a key difference between the present case and *DeFusco*. *See id.* at 729, 732.

Therefore, it is our opinion that the release and waiver of claims provision contained in the forbearance agreement does not fall "within [the] narrow category

---

[24] A "Hobson's choice" is defined as "[a]n apparently free choice that offers no real alternative." The American Heritage Dictionary of the English Language 835 (4th ed. 2006). The reference is to Thomas Hobson (1544-1630), "English keeper of a livery stable, from his requirement that customers take either the horse nearest the stable door or none." *Id.*

of cases" in which this Court will permit a debtor's release of a usury claim. *DeFusco*, 440 A.2d at 732.

## The Choice-of-Law Provisions

In the course of ruling on the various motions for summary judgment, the trial justice ruled that Rhode Island law governed the $4 million and the $350,000 loan agreements, despite the choice-of-law provisions designating Massachusetts law. On appeal, the RFP defendants contend that the trial justice's ruling conflicts with this Court's holding in *Sheer Asset Management Partners v. Lauro Thin Films, Inc.*, 731 A.2d 708 (R.I. 1999).

The question that this Court must resolve is whether, under the circumstances of this case, the State of Rhode Island has a materially greater interest than the Commonwealth of Massachusetts in determining whether HR4-A has exceeded the statutory maximum interest provisions of the usury statute. Rhode Island has long acknowledged that parties may choose the law that will govern their contractual disputes. *See Sheer Asset Management Partners*, 731 A.2d at 710; *Owens v. Hagenbeck-Wallace Shows Co.*, 58 R.I. 162, 174, 192 A. 158, 164 (1937). However, such provisions are not without restrictions. In *Owens*, this Court stated that "no stipulations of the parties as to the law they intend to have govern their contract will be given effect to, if it is considered to be contrary to the public policy of the law of the forum." *Owens*, 58 R.I. at 174, 192 A. at 164.

This principle is reflected in the Restatement (Second) *Conflict of Laws* § 187(2)(a) (1971), which has been adopted by Rhode Island and echoes the well-settled choice-of-law principle that this Court enunciated in *Owens*. *See Sheer Asset Management Partners*, 731 A.2d at 710. Section 187 provides,

> "(1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

> "(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

>> "(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

>> "(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

> "(3) In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law." Restatement (Second) *Conflict of Laws* § 187.

In accordance with § 188 of the Restatement (Second) *Conflict of Laws*, in the absence of an effective choice-of-law provision, the state law that governs a transaction is the state that "has the most significant relationship to the transaction."

Section 188(2) identifies several contacts that are to be considered in this analysis. Those contacts are:

> "(a) the place of contracting,
> "(b) the place of negotiation of the contract,
> "(c) the place of performance,
> "(d) the location of the subject matter of the contract, and
> "(e) the domicil, residence, nationality, place of incorporation and place of business of the parties."
> Restatement (Second) *Conflict of Laws* § 188.

Turning to § 187(2)(a), it is clear that the "chosen state[,]" Massachusetts, has a substantial relationship to the $4 million loan and the $350,000 loan. The $4 million loan was secured, in part, by a mortgage interest in property in Massachusetts before it was amended and restated in 2005, and the lender of both loans, HR4-A, is a Massachusetts company with a principal place of business located in Massachusetts. *See Sheer Asset Management Partners*, 731 A.2d at 710 (holding that a lender's state of incorporation in a designated forum state is sufficient to create a "substantial relationship" pursuant to Restatement (Second) *Conflict of Laws* § 187(2)(a)). Although the Court in *Sheer Asset Management Partners* reached only § 187(2)(a), we are of the opinion that § 187, in its entirety, is sound. Thus, our analysis turns to § 187(2)(b) and we consider whether Rhode Island has a "materially greater interest" than Massachusetts in the determination of the legality of the loans at issue.

The $4 million loan and the $350,000 loan have significant ties to Rhode Island, giving this state a materially greater interest in the determination of the issue

of the legality of the loans than does Massachusetts. The loans were primarily secured by Rhode Island real estate, and the agreements relating to the loans were all executed in Rhode Island. Further, the commercial borrowers for both notes are Rhode Island entities, and the individual borrowers on the $4 million loan are domiciled in Rhode Island. Under § 188(2) of the Restatement (Second) *Conflict of Laws*, the laws of Rhode Island would govern the $4 million loan and the $350,000 loan in the absence of effective choice-of-law provisions to the contrary. The $4 million note was executed in Rhode Island; both loans were secured by property mostly located in Rhode Island; the subject matter of the contract—to wit, the Centre of New England project—was located in Rhode Island; and each of the several borrowers on the notes were domiciled in Rhode Island.

Given that Rhode Island has a materially greater interest in the legality of the loans at issue in this case than does Massachusetts, and that Rhode Island law would apply in the absence of an effective choice-of-law provision to the contrary, the question is whether, in accordance with § 187(2)(b) of the Restatement, application of Massachusetts law would be contrary to a fundamental policy of Rhode Island.

As discussed *supra*, Rhode Island imposes a statutory maximum interest rate on loans. Massachusetts, on the other hand, effectively does not.[25] *See Kaur v.*

---

[25] "The Massachusetts law against usury creates an annual interest rate cap of 20%, beyond which one is 'guilty of criminal usury.'" *Kaur v. World Business Lenders, LLC*, 440 F. Supp.3d 111, 118 (D. Mass. 2020) (quoting Mass. Gen. Laws ch. 271,

*World Business Lenders, LLC*, 440 F. Supp.3d 111, 122 (D. Mass. 2020) (describing Massachusetts' usury laws as "toothless"). Because the case at bar involves purportedly usurious loans—which loans Rhode Island has a strong policy against— a determination that the loans in question are not usurious because of the application of Massachusetts law, as opposed to Rhode Island law, would be contrary to a fundamental public policy of Rhode Island. *See NV One, LLC*, 84 A.3d at 810 (noting that Rhode Island has "a strict policy against usurious transactions").

This is distinguishable from *Sheer Asset Management Partners*, cited *supra*, a case involving purportedly usurious loan transactions involving the states of New York, Connecticut, and Rhode Island. *Sheer Asset Management Partners*, 731 A.2d at 709. In that case, New York had the most significant relationship to the transactions and, therefore, the law of that jurisdiction would have applied in the absence of a choice-of-law provision. *Id.* The parties' choice to apply the law of Connecticut was effective, however, because both New York and Connecticut did not recognize usury as a defense in a loan transaction. *Id.* at 709-10. Here, by contrast, there is a stark difference between the usury laws of Massachusetts and Rhode Island, with Rhode Island providing much greater protection to borrowers

---

§ 49(a)). However, the interest rate cap does not apply "to any person who notifies the attorney general of his intent to engage in [an otherwise usurious] transaction or transactions * * * providing any such person maintains records of any such transaction." Mass. Gen. Laws Ann. ch. 271, § 49(d).

(and to lenders) than Massachusetts.  Therefore, it is our opinion that Rhode Island law governs the $4 million loan and the $350,000 loan.

**The Remaining Indebtedness of Plaintiffs**

The RFP defendants aver that, in ruling that the $14 million loan and the $7 million loan were usurious, the trial justice erred by failing to find that the pre-2000 debt remains due and payable because those loans were made prior to the accrual of any usurious interest rates.  In support of their contention, the RFP defendants cite to the proposition that contracts that are not usurious at the time of execution cannot be "tainted with usury by any subsequent usurious transaction with respect thereto." Comment Note, 102 A.L.R. 573 § 2 (1936).

It is well settled that "[c]ontracts in violation of § 6-26-2 are usurious and void, and the borrower is entitled to recover any amount paid on the loan." *NV One, LLC*, 84 A.3d at 805 (citing § 6-26-4).  Further, it is an elementary principle that a substitute contract that has been executed in satisfaction of an obligor's existing duty under a previously executed contract has the effect of extinguishing the previous contract giving rise to said duty and discharging any rights with respect thereto. *See St. Germain v. Lapp*, 72 R.I. 42, 49, 48 A.2d 181, 185 (1946); *see also* 6 Corbin, Contracts, § 1293 at 189 (2d ed. 1962); Restatement (Second) *Contracts*, § 279(2) (1981).

It is apparent from the record that, after the receivership plaintiffs and the Cambio plaintiffs were unable to make payment on the pre-2000 debt, the RFP defendants agreed to refinance the debt under new loans. There is no indication that the refinanced loans were simply amendments to the loans that formed the basis of the pre-2000 debt. The refinanced loans carried higher interest rates than the previous loans, established different terms of repayment, and do not reflect that any prior obligations of the borrowers were preserved. It is clear from the record that the refinanced loans extinguished the pre-2000 loans. *See St. Germain*, 72 R.I. at 49, 48 A.2d at 185 ("[T]he existing loan of the original lender was paid, its chattel mortgage securing it discharged, a wholly new loan was obtained from a new lender, and a new note and mortgage containing different terms were executed and delivered to take the place of the original note and mortgage."); Restatement (Second) *Contracts*, § 279(2) ("[A] substituted contract discharges the original duty and breach of the substituted contract by the obligor does not give the obligee a right to enforce the original duty."); 13 Corbin, Contracts, § 71.1(2) at 401 (a substituted contract is a type of accord and satisfaction because "the agreement instantly operates as a satisfaction and discharges the previously existing claim or claims"). Therefore, the RFP defendants' reliance on 102 A.L.R. 573 is misplaced, and the pre-2000 debt does not remain due and payable.

**Conclusion**

For the reasons set forth in this opinion, we affirm the judgment appealed from and remand the papers in this case to the Superior Court.

Justice Lynch Prata did not participate.

**Justice Robinson, concurring in part and dissenting in part.** I am pleased to concur in the entirety of the Court's well-analyzed and well-articulated opinion in this case with the sole exception of its ruling as to the choice of law issue. Where I part company with the majority is in its conclusion that "[b]ecause the case at bar involves purportedly usurious loans—which loans Rhode Island has a strong policy against—a determination that the loans in question are not usurious because of the application of Massachusetts law, as opposed to Rhode Island law, would be contrary to a fundamental public policy of Rhode Island."

Quite simply, it is my opinion that Rhode Island's public policy with respect to usurious loans does *not* rise to the level of being fundamental. I think it should be self-evident that, if such a public policy were truly fundamental, the General Assembly would not have voted to provide an exception to this state's usury law with virtually no public controversy. To my mind, the fact that G.L. 1956 § 6-26-2(e) was enacted by our democratically elected General Assembly is conclusive

evidence of how decidedly *not fundamental* the public policy with respect to usury is in Rhode Island.

As such, in accordance with Restatement (Second) *Conflict of Laws* § 187 (1971), the $4 million loan and the $350,000 loan should be governed by Massachusetts law (not by Rhode Island law), in accordance with the choice of law provisions explicitly provided in the pertinent loan documentation.

Accordingly, I record my respectful dissent. I believe that the agreed-upon choice of law provision should control.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI 02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Commerce Park Realty, LLC, et al. v. HR2-A Corp. as General Partner of HR2-A Limited Partnership et al. |
| **Case Number** | No. 2019-468-Appeal. (PB 11-1922) |
| **Date Opinion Filed** | June 30, 2021 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, and Long, JJ. |
| **Written By** | Associate Justice Melissa A. Long |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Sarah Taft-Carter |
| **Attorney(s) on Appeal** | For Plaintiffs:<br><br>Brian LaPlante, Esq.<br>R. Thomas Dunn, Esq.<br>Richard G. Riendeau, Esq.<br>Michael J. Jacobs, Esq.<br>Thomas M. Dickinson, Esq.<br>John O. Mancini, Esq.<br>Nicole M. Matteo, Esq.<br>Matthew J. McGowan, Esq. |
| | For Defendants:<br><br>Robert D. Wieck, Esq.<br>William J. Delaney, Esq. |

SU-CMS-02A (revised June 2020)